MAX SCHWARTZMAN ET AL. V. LONDON & LANCASHIRE FIRE INSURANCE COMPANY, Appellant.—2 S. W. (2d) 593.

Court en Banc, February 4, 1928.

Leahy, *Saunders & Walther* for appellant.

*Laughlin, Frumberg, Blodgett & Russell* for respondents.

*Laughlin, Frumberg, Blodgett & Russell* for respondents in Court en Banc.

DAVIS, C.—This is a suit in. equity to set aside and cancel an appraisal had under the terms of a fire insurance policy issued by defendant to plaintiffs, covering the furnishings and contents of the Miller Hotel, in Minneapolis, Minnesota, and to recover the loss and damage resulting from a fire. The trial court set aside and canceled the appraisal, fixing the sound value of the contents of the hotel at $55,000 and the loss at $51,600. As the policy issued by defendant was one of a number aggregating $55,000, the trial court found defendant's proportion of the loss and damage to be $9381.82, with interest accrued thereon of $1295.56, rendering judgment for $10,587.38 in favor of plaintiffs, from which defendant appealed.

The assignment of errors comprises two specifications: first, the court erred in canceling the appraisal and refusing to find for plaintiff in an amount equal to defendant's proportionate share of the award, and, second, the court erred in finding and fixing the loss and damage at $51,600 and in rendering judgment against defendant in an amount based on this finding.

The facts develop that in August, 1920, plaintiffs purchased the Miller Hotel, paying for it, according to their evidence, the sum of $55,000, and receiving therefor a bill of sale which plaintiff failed or refused to offer in evidence or account for. We think we are justified from the evidence in stating that the purchase comprised the hotel as a going concern and included the good will, the lease and all appurtenances. The hotel comprised 158 bedrooms, the original furnishings of which in 1916 cost $14,085.67. Plaintiffs' insurance policies aggregated $55,000, of which the policy in suit, issued August 17, 1920, for $10,000, covered, according to the policy, the property described as follows:

"The amount insured by this policy covers and applies on hotel and other furniture, furnishings and fixtures of every kind and descriptions; wall and ceiling decorations and other improvements and betterments to the building made by assured as tenants or made by former lessees of the herein described premises; printed books, family wearing apparel, silver and plated ware, pictures and paint-

ings (at not exceeding cost) and their frames, sculpture, tools, musical instruments, billiard and pool tables and their appurtenances, tools, utensils, fire extinguishing apparatus, electric fans, signs, awnings; fuel, and all other equipment, appliances, implements, articles, materials, supplies other than stock of merchandise and effects in any way used in or pertaining to the business of assured."

The building, in which the business of the Miller Hotel was carried on, caught fire on February 13, 1921, about one A. M. Thereafter, in accordance with the terms of the insurance policies, the insurance companies subject to the risk and the plaintiffs provided a joint appraisal, the plaintiffs naming an appraiser as did the insurance companies, and the Minneapolis court appointing an umpire. The board of appraisers fixed the sound value of the property insured at $38,669.11, and the loss and damage at $30,000, the report being signed and assented to by the two appraisers and the umpire, acting as an appraisal board. Plaintiffs, dissatisfied with the damages awarded them, brought this suit to set aside the appraisal, averring that while plaintiffs' appraiser was disinterested and impartial, neither defendant's appraiser nor the umpire were disinterested and impartial and that defendant's appraiser was guilty of misconduct. Such other facts as are pertinent will later appear.

I. The insurance policy sued on provides the appointment of competent, disinterested and impartial appraisers and an umpire. The evidence discloses in this regard that the umpire appointed by the court was treasurer, secretary, and stockholder of the David C. Bell Investment Company, whose business consisted of real estate, loans, insurance and rentals. Under the Minnesota law a corporation is disqualified from acting as agent for an insurance company. While employees of the above company were appointed agents of various insurance companies, the earnings on the business involved went into the coffers of the Bell Investment Company. On February 13, 1921, no insurance company involved in fire loss sustained by plaintiffs was represented by said investment company or its officers or employees. The umpire, appointed about April 1, 1921, took oath as appraiser April 27, 1921. During the interval employees of the Bell Investment Company were appointed agents of the Firemen's Insurance Company of Newark, which company was a party to the arbitration. The umpire knew of the agency after his appointment and before he qualified as umpire, which fact he failed to divulge. As a stockholder of the Bell Investment Company he was entitled to receive dividends, which necessarily included earnings of the business brought to it by the Fireman's Insurance Company. He thus became interested, indirectly though it may be, as agent of the insurance company involved in the appraisal, and consequently disqualified and incompetent to

1096

act as umpire.  Even though the evidence tends to establish that
no conscious or actual bias, prejudice, influence or fraud was dis-
closed on the part of the umpire, yet public policy and an uncon-
scious predilection to favor one's interest renders an arbitrator, di-
rectly or indirectly interested in the result of the arbitration, par-
tial, incompetent and disqualified.  It is evident from what we have
said that the appraisal was void and of no effect, thus obviating the
necessity of considering the competency of defendant's appraiser.
[Goodwin v. Ins. Co., 118 Iowa, 601; Schoenich v. Ins. Co., 109 Minn.
388; Assurance Co. v. Hall, 143 Ala. 168; Railway Conductors' Bene-
fit Assn. v. Robinson, 147 Ill. 159; Produce Refrigerating Co. v. Ins.
Society, 91 Minn. 210; Hyeronimus v. Allison, 52 Mo. 102.]

II.  That, in an equity suit, the cause is triable *de novo*, thus
constituting the appellate court the trier of fact as well as of equi-
table principles, is the generally accepted doctrine, ad-
hered to in this State.  [Harwood v. Toms, 130 Mo. 225,
32 S. W. 666; Canty v. Halpin, 294 Mo. 118, 242 S. W. 97.]

III.  We are thus brought to a review of the second specification
of error.  This relates to the action of the trial court in finding and
fixing the loss and damage, suffered by plaintiffs, in the sum of
$51,600.  Plaintiffs, in arguing the soundness of the
trial court's finding, state on the one hand that the
trial court, sitting in equity, decreed the award can-
celed, and that, relative to that finding, this court is not, of course,
bound.  Conversely, they maintain that in fixing and ascertaining
the value of the property, the amount of damage and the consequent
recovery, the trial court was not sitting as a chancellor, but as a law
court, deciding a strictly legal question resulting in a money judg-
ment at law.  Therefore, they assert, as there was substantial evi-
dence upon which to base the finding of loss and damage, the action
of the trial court is in that regard not open, to review.

The cause here litigated was cognizable in a court of equity and
it was the duty of such court to refuse to enter a partial or incom-
plete decree.  If plaintiffs maintained the equitable grounds for relief,
then, in order to avoid a multiplicity of suits and render a full, com-
plete, effectual and final decree adjusting the equities of the parties
in interest, a court of chancery, having taken jurisdiction on any equi-
table ground, will reach out and determine all matters in controversy
and will retain jurisdiction of the litigation connected with the subject
of action until all matters involved are disposed of, even though it is
thereby required to determine strictly legal questions or to grant legal
remedies.  [10 R. C. L. pp. 370-371; Martin v. Jones, 286 Mo. 574,
228 S. W. 1051; Marston v. Catterlin, 290 Mo. 185, 234 S. W. 816;

Hurst Switch & Signal Co. v. Trust Co., 291 Mo. 54, 236 S. W. 58; Jacobs v. Cauthorn, 293 Mo. 154, 238 S. W. 443; Gloyd v. Gloyd, 293 Mo. 163, 239 S. W. 73; Canty v. Halpin, 294 Mo. 118, 242 S. W. 97; Williamson v. Frazee, 294 Mo. 320, 242 S. W. 958; Brightwell v. McAfee, 249 Mo. 562, 155 S. W. 820.]

Analyzing the question raised by plaintiff in the light of the above rule and authorities, if plaintiffs' equitable case was proved, then it was the duty of the trial court, sitting in equity, to render full, complete and effectual relief, including the determination of loss and damage to plaintiffs resulting from the fire. While the determination of loss and damage is a legal question, absent equitable jurisdiction, yet if plaintiff's case, relative to the cancellation of the appraisal, was proved, then the court was empowered to reach out and draw to itself within the limits of the pleadings all matters connected with the subject of action and to determine all legal and equitable questions litigated and involved. This ruling determines all matters, including otherwise legal matters, subject to equitable procedure, so that the cause in its entirety becomes triable in an appellate court *de novo*, authorizing and empowering such court to become the trier of fact. As trier of fact, it then becomes the duty of the court to determine the soundness of the award of loss and damage below, even though there was substantial evidence on which to base the finding. Due deference, however, should be accorded to the determination of the chancellor.

IV. We are thus brought to the consideration of the soundness of the trial court's finding, with respect to the loss sustained. The illuminative fact is that the hotel furnishings cost in 1916, $14,085.67, purchased from Boutell Brothers of Minneapolis, as shown by the testimony of Morawetz, who made the sale. These furnishings comprised, among other things, beds, carpets, dressers, chairs, linens, towels, etc., although some articles, such as linens and towels, during the interval between the purchase and the fire, were replenished.

Plaintiffs' evidence tended to show, through the testimony of plaintiff Rodenberg, that an itemized list of the articles contained in each room was made, which was offered and showed in three columns, the "Cost New, Actual Value, and Loss and Damage." He then testified that the list showed in detail all the items and their value as of February 12, 1921. This list placed the actual value of the property in the hotel at $99,106.20, and the damage thereto at $77,532.40, a difference between sound value and damage of nearly $22,000. He further testified that the salvage was sold after the fire for $3400.

All the other evidence of witnesses for plaintiffs as to value was submitted in depositions. One Brecher, a furniture dealer in Minneapolis, stated that he checked the items on the list, placing a valuation on them of $63,477, and estimating the loss at $51,938.08; that

he arrived at the damage by deducting the salvage value of the property as he appraised it, but that he figured the salvage too high and that it was not worth over $5,000, bringing the loss and damage in his opinion to $58,000. There was also offered in connection with his testimony a list similar to the list offered by plaintiff Rodenberg.

Witness Mack for plaintiff stated that for a considerable length of time he was in the employ of the New England Furniture Company, a Minneapolis furniture concern. He, too, furnished a list and constructed his estimate in a similar manner to that of Rodenberg, estimating the loss at $60,261.74.

Witness Teslow, a furniture salesman of seven years' experience, offered a likewise similar list, stating that he estimated the damage at $50,650.59.

Witness Chisholm, offering a similar list of items, placed a sound value of $72,102.04 on the property and estimated the loss and damage at $54,070.83.

Edward Lamb, plaintiffs' witness, testified to the loss and damage to the heating and plumbing equipment, but as it is evident from the testimony that such equipment was owned by the fee-holder of the building, such testimony will be disregarded in estimating the loss and damage.

Defendant's evidence tended to show, through witness Morawetz, in charge of the hotel furnishing department of Boutell Brothers, that he sold for his company in 1916 the furnishings to the owner of the hotel for $14,085.67. That he had been in the furniture business for about forty years, in the hotel furnishing business for about eighteen years, and was familiar with the furnishings involved, producing at the trial the original contract under which the goods were sold. He testified that the articles listed in the bill of sale were almost identical with the articles listed in plaintiffs' schedules; and that he was familiar with such items as well as the reasonable value of same, at the date of the fire. The replacement cost, at the time of the fire, of the articles listed in plaintiffs' schedules was about $35,000. This sum represented the new cost on a time-payment basis, but the cash value of the furnishings was ten or fifteen per cent less, that is, not exceeding $31,500. That the actual value of the property within five years would depreciate forty per cent.

The evidence further showed that there were sixty-six bedrooms in the main building, fifty-six of which were furnished exactly as Room 116, and ten of them exactly as Room 100. In the Annex all of the rooms were furnished exactly as Room 132.

Witness Morawetz was asked to give the new cost of each item in these different rooms, which was done. We herewith set out the result of his testimony in the following table, the first column of which contains the new cost of the furnishings as estimated by plain-

tiffs, and the second column showing the new cost according to Morawetz, who originally sold the furniture damaged by the fire. The blanks in defendant's "New Cost" column indicate items that Morawetz refused to testify concerning, because he did not know the value of the items. The item and costs as contained in Rooms 100, 116 and 132 are as follows:

### Room 100—Main Building.

| | Plaintiffs' "New Cost" | Defendant's "New Cost" |
|---|---|---|
| 1 Holland window shade | $ 2.10 | |
| 2 Marquisette sash curtains | 4.50 | |
| 4 rods and fixtures, 45 cents, | 1.80 | |
| 1 dresser cover | .75 | |
| 30 yards W. V. carpets | 205.50 | $85.00 |
| 1 mah. dresser | 110.00 | 68.00 |
| 1 tapestry uph. rocker | 50.00 | 18.00 |
| 1 tapestry uph. arm chair | 40.00 | 18.00 |
| 1 wood-seat chair | 12.50 | 3.25 |
| 1 mah. finish table | 30.00 | 12.50 |
| 1 mah. finish wardrobe | 60.00 | 26.25 |
| 1 mah. Adam period bed | 65.00 | 45.00 |
| 1 felt mattress | 16.20 | 8.00 |
| 2 pillows, 6 pounds | 4.50 | 3.00 |
| 2 pillow slips, 46 cents, | .92 | .60 |
| 2 sheets, $1.85 | 3.70 | 3.50 |
| 1 bed spread | 3.00 | 2.85 |
| 1 matt. pad | 3.00 | 3.25 |
| 2 wool and cotton blankets, $4.75 | 9.50 | 4.60 |
| 1 tray | .20 | |
| 1 pitcher | .60 | |
| 2 glasses | .40 | |
| 1 cuspidor | .90 | |
| 1 waste basket | 2.90 | |
| 1 sagless spring | 9.60 | 7.50 |
| 1 costumer | 5.00 | |
| 1 three-light ceiling fixture | 18.00 | |

### Room 132—Annex.

| | Plaintiffs' "New Cost" | Defendant's "New Cost" |
|---|---|---|
| 1 window shade | $ 2.10 | |
| 1 walnut finish V. M. bed | 19.25 | $12.75 |
| 1 sagless spring | 9.60 | 7.50 |
| 1 mattress | 16.20 | 8.00 |
| 2 pillows, 6 pounds | 4.00 | 3.00 |
| 1 mah. finish dresser | 48.50 | 24.00 |

| | Plaintiffs' "New Cost" | Defendant's "New Cost" |
|---|---|---|
| 1 chair | 12.50 | 3.25 |
| 1 W. E. mirror | 4.50 | |
| 1 ceiling light fixture | 2.50 | |
| 1 mattress pad | 3.00 | 3.25 |
| 2 sheets, $1.85 | 3.70 | 3.50 |
| 2 pillow slips | .92 | .60 |
| 1 bed spread | 3.75 | 2.85 |
| 1 pr. C. & W. blankets | 4.50 | 3.00 |
| 1 tray | .20 | |
| 2 glasses | .40 | |
| 1 pitcher | .60 | |
| 1 jar | 2.95 | |
| 1 waste basket | 2.90 | |
| 1 cuspidor | .90 | |
| 3 yards floor runner, $3.50 | 10.50 | |

### Room 116—Main Building.

| | Plaintiffs' "New Cost" | Defendant's "New Cost" |
|---|---|---|
| 2 Marq. curtains | $ 4.50 | $ 2.85 |
| 4 rods and fixtures, 45 cents, | 1.80 | 1.80 |
| 25 yards carpet, $6.25 | 156.25 | 71.25 |
| 1 mah. finish dresser | 60.00 | 29.00 |
| 1 mah. finish table | 30.00 | 12.50 |
| 1 rocker, lea. seat | 21.00 | |
| 1 chair | 12.50 | 3.25 |
| 1 mah. wardrobe | 60.00 | 26.25 |
| 1 ceiling light fixture | 5.25 | |
| 1 W. E. Mirror | 4.50 | |
| 1 walnut finish V. B. bed | 19.25 | 12.75 |
| 1 sagless spring | 9.60 | 7.50 |
| 1 mattress | 16.20 | 8.00 |
| 2 pillows, 2 pounds | 4.50 | 3.00 |
| 2 sheets, $1.85 | 3.70 | 3.50 |
| 2 pr. C. & W. blankets | 9.00 | 4.60 |
| 1 bed spread | 3.75 | 2.85 |
| 1 towel rack | .70 | |
| 2 towel racks | .48 | |
| 1 tray | .20 | |
| 1 pitcher | .60 | |
| 1 glass | .20 | |
| 1 jar | 2.95 | |
| 1 waste basket | 2.90 | 1.75 |

Witness Keith for defendant testified that he had been in the furniture business for thirty-five years; that in 1916 he bid on the furniture to go in the hotel; that he subsequently visited the hotel

and inspected the furniture both before and after the fire; that it was the same furniture sold the hotel by witness Morawetz. That the cost of the furniture new would be, on a cash basis, $38,241.55. That after the fire he went over the property and checked it off, room for room, on the schedules furnished him. That he arrived at the actual value of the property by taking the new cost and then deducting thirty to thirty-three and a third per cent for depreciation for the five years' use. This witness appeared at the hearing before the appraisers and there testified that the actual value of the property before the fire was $26,552.64 and the loss and damage $15,834.85.

Witness Tergen for defendant testified that he had been in the furniture manufacturing business for about twenty-five years, and that he put in seven days inspecting the property after the fire. That the new cost listed on plaintiffs' schedule was on an average seventy-five per cent higher than the actual new cost of the articles. That the replacement value of this property immediately before the fire, in his opinion, was $32,631.99, and the sound value $21,886.55.

Witness Mansfield, the appraiser appointed by plaintiffs, testified that he considered $30,000 as the fair value of the loss suffered by plaintiffs, and that he was not interested in any of the insurance companies. The evidence further shows that appraiser Mansfield, in connection with the other appraiser and umpire, signed the award for $30,000. The evidence further tends to show that retail selling price of furniture was from fifty to eighty per cent higher than selling price of furniture for hotels.

The decisive question involves the weight of the evidence. As plaintiffs were charged with the affirmative, that of demonstrating the amount of the loss, the burden of proof establishing the value of the furnishings rests on plaintiffs and remains there until the end. Hence, it was incumbent on plaintiffs to show the amount of the loss by the greater weight of the evidence. The weight of the evidence does not necessarily involve the number of witnesses testifying, but rather considers the probability of the verity of the testimony in the light of all the surrounding facts and circumstances in evidence. We thus approach the question.

Examining plaintiffs' evidence, we find that plaintiff Rodenberg, although he had not been in the furniture business for ten years, valued the furnishings on the day of the fire at $66,318.14 and the loss at $53,230.28. Other than his prior knowledge of the business, the witness discloses nothing on his part tending to show knowledge of value at the time of the loss or the verity of his testimony. Such testimony is relatively of little probative value.

Witnesses Brecher, Mack, Teslow and Chisholm placed the actual value of the furnishings from $63,000 to $72,000, and the loss from $50,000 to over $60,000. Viewed in the light that sales of furniture at retail ranged from fifty to eighty per cent higher than furniture

sold in quantities to hotels, we infer, from a study of the evidence, that the value placed by these witnesses on the furnishings contemplated sales at retail rather than to hotels.

Other facts, however, depreciate the probative force of plaintiffs' testimony. The record is without evidence that any of plaintiffs' expert witnesses on value, save Rodenberg, ever saw the furniture other than in a damaged condition after the fire. Without the benefit of visualizing the furnishing except in a damaged state, the witnesses in fixing values were affected and persuaded, we infer, by plaintiffs' evidence and suggestions tending to puff and magnify the quality, as shown by the testimony that a portion of the furniture was solid mahogany and that the carpets were worth $6.85 a square yard. By analyzing plaintiffs' evidence, we further find that the average sound value placed by their witnesses on the furnishings was something over four and one-half times the cost price in 1916. The evidence and common knowledge of conditions persuades us, especially in the light of the usage of the furniture for five years in a hotel, that values were by these witnesses puffed and magnified out of all reason, so as to render their testimony of little value.

On the other hand, we think defendant's position is sustained by the greater weight of the evidence. This is demonstrated by a series of facts. First, Boutell Brothers' salesman, who negotiated the sale, produced the original contract of sale, showing an initial cost of $14,085.67. He therefore knew the actual furnishings, the condition and quality, and the initial value. With these facts in mind, together with his knowledge of values, he could with probable verity estimate the value preceding the fire and the subsequent loss. Second, the same salesman placed the new cost price of the furnishings, as of the day of the fire, at $35,000 on time-payment and $31,500 on cash basis. From his non-interest in the controversy, his experience, his knowledge of furniture, the business, the original furnishings and values, and his means of knowledge, this testimony imports verity, and is in accord with common knowledge on the subject. Third, support is given this evidence by witness Keith, who bid on the original furnishings, also an employee of a large and responsible firm, and without interest in the controversy. Keith observed the furnishings both before and after the fire, recognizing them as practically identical articles sold by Boutell Brothers to the hotel. His experience, means of knowledge and non-interest in the result justifies confidence in his estimate that the furnishings could be replaced new for about $38,000. Fourth, witness Tergen fixed the replacement value, that is, the new cost of the furnishings immediately before the fire, at $32,-631.99. Fifth, witness Mansfield, a lawyer, plaintiffs' appraiser, denominated in the petition disinterested and impartial, after a full hearing lasting about twenty days, fixed the loss at $30,000. Sixth, the use of the furnishings from 1916 to 1921 in the hotel, a period

of five years, depreciated the value from thirty to forty per cent, according to the evidence.

The insurance policy covered the actual loss only, that is, the value of the furnishings in the condition found, including depreciation, immediately preceding the fire. According to plaintiffs the benefit of any doubt relative to value, we think the furniture could have been replaced new for $38,000, which is more than two and one-half times the original cost. Allowing a depreciation of thirty per cent, we fix the sound value of the furnishings immediately preceding the fire at $26,600. This, however, does not include items covered by the policy, such as paintings and papering, signs, ice boxes, screens, phone installations, etc., placed, affixed and installed in the building by plaintiffs between August, 1920, and February, 1921, which items plaintiffs are allowed. These items total slightly less than $9400. Deducting the item of $3400 salvage received by plaintiffs from the aggregate of the $36,000 actual value, we fix plaintiffs' loss and damage at the sum of $32,600, and reverse the judgment and remand the cause with directions to the trial court to enter judgment for plaintiffs for ten fifty-fifths of $32,600, to-wit, $5929.09, together with interest thereon at the rate of six per cent per annum from April 13, 1921, to the date of entering judgment. *Higbee, C.;* dissents.

PER CURIAM:—This cause coming into Court en Banc, the foregoing opinion by DAVIS, C., in Division Two, is adopted as the opinion of the court. All of the judges concur, except *Walker, C. J.,* who dissents in a separate opinion filed.

WALKER, C. J. (dissenting).—I do not concur in the reasoning employed or the conclusions reached in the majority opinion. My views in the main are those of Commissioner HIGBEE, who wrote the opinion in Division Two, and the cause having been transferred to Court en Banc his opinion was rejected, and the opinion of Commissioner DAVIS adopted over my dissent.

This is an action in equity to set aside an appraisal under the terms of a fire insurance policy issued by the defendant and to recover damages for the loss and damage to the property insured. The court found the issues for the plaintiffs and from a judgment in their favor the defendant has appealed.

No question is raised as to the pleadings, and an outline of the same will suffice to define the issues and determine whether they were sustained by the evidence. The action was begun in the Circuit Court of the City of St. Louis. The amended petition avers that the plaintiffs, Max Schwartzman, Ben Schwartzman, Harry Schwartzman, Victor Horwitz and H. G. Rodenberg, co-partners, doing business under the name of Schwartzman Brothers & Company, at the times therein

1104

stated, owned and operated hotels in various cities of the United States; that on August 14, 1920, they owned and operated a hotel known as the Miller Hotel in Minneapolis, Minnesota, with the furniture, furnishings and fixtures therein; that on August 17, 1920, the defendant issued a policy by which it insured the plaintiffs as Schwartzman Brothers & Company for one year against loss or damage by fire to the furniture, furnishings and fixtures in said hotel to the amount of $10,000; that on February 13, 1921, while said insurance was in force the property so insured and located in said building was damaged and partially destroyed by fire to the amount of $70,-000; that said policy permitted other insurance and that at the date of said loss there was other insurance on said property in the sum of $60,000 (naming the companies and the amount insured by each); that the total loss and damage exceeded the whole amount of insurance thereon, and that plaintiffs are entitled to recover the full sum of $10,000, the amount of said policy; that plaintiffs rendered to the defendant a sworn statement in writing of said loss and damage, etc., as required by the policy; that said policy provided in case of loss or damage by fire to the property, the plaintiffs should recover from defendant no greater proportion of the loss than the sum insured should bear to the total insurance; that on a failure of the parties to agree as to the amount of the loss, such loss should be ascertained by two competent, disinterested and impartial appraisers, the insured and the defendant each selecting one, and the two appraisers choosing a third to act as umpire, and failing to select an umpire he should be appointed by the presiding judge of the district court of the county in which the loss occurs; that the appraisers, together, should appraise the loss, stating separately sound value and damage and, failing to agree, shall submit their differences to the umpire and the award of any two should determine the loss; that defendant refused to pay the loss and plaintiffs demanded an appraisement; that they named John A. Mansfield as appraiser; the defendant named M. J. Trevor as appraiser and the district judge of Hennepin County, Minnesota, appointed Paul E. Von Kuster as umpire; that the three acting as appraisers in June, 1921, found and awarded that the sound value of the property so insured at the time of the fire to be $38,669.11 and that the loss and damages occasioned by the fire was $30,000.

It is then averred that Trevor and Von Kuster were not impartial or disinterested appraisers, but were partisans of and biased and prejudiced in favor of the defendant; that Trevor entered into an agreement with the defendant that he should be paid as his fees for the appraisement more than twice the fees allowed by law, and before and after his appointment as appraiser he acted as agent for the defendant and made an *ex parte* examination of the damaged property; that Von Kuster was a stockholder and officer of the David C. Bell

Investment Company, which company was agent of the Firemen's Insurance Company of Newark, which was one of the companies that had policies of insurance on the property damaged and destroyed by the fire; that the appraisement was participated in by all of the fire insurance companies mentioned, and that said Trevor and Von Kuster were not competent, impartial or disinterested appraisers; that said award is grossly inadequate and by reason of the premises is fraudulent. The prayer is that the award be set aside and that plaintiffs have judgment for $10,000 with interest.

The answer admits plaintiffs' ownership of the furniture, etc., the insurance thereof by the various insurance companies named and the prorating provisions of the policies; the fire and loss and damages to the property in the sum of $30,000; the provisions for the appointment of two appraisers and an umpire, and their appointment to appraise the loss and damage by the fire; avers that Trevor and Von Kuster were competent, impartial and disinterested appraisers; traverses the averments of the petition that either was interested or guilty of misconduct in their appraisement, and avers that the appraisement was in all respects fair, just and impartial, and that defendant was willing to pay its proportional part of the award. The reply is a general denial.

There are only two assignments of error: (1) the setting aside the award; and (2) the finding that the loss and damage was $51,000 and in rendering judgment against the defendant on an amount based on this finding.

The appraisal of the loss and damage by fire to plaintiffs' property, covered by the defendant's policies and those of several other insurance companies in the sum of $55,000, was participated in by all of the insurance companies interested. They were all parties to the appraisal and were represented by counsel. One of these companies was the Firemen's Insurance Company of Newark. Acting collectively they nominated Morris J. Trevor, a furniture dealer in Minneapolis, as one of the appraisers, and joined with the plaintiffs in asking the judge of the district court of Hennepin County, Minnesota, to appoint an umpire as provided in the policy and on such request Paul E. Von Kuster was appointed as umpire. The appellant assigns error in the finding of the trial court that neither of these men was a competent, fair, impartial or disinterested appraiser.

The statutory law of Minnesota relative to an appraisal of this character is not pleaded or proved, and it is agreed that the matter must be determined according to the principles of the common law. The policy in suit, however, provides for the appointment of competent, disinterested and impartial appraisers, and an umpire in the event of a failure of the parties to agree on the amount of the loss; "the appraisers, acting together, shall then estimate and appraise

the loss, stating separately sound value and damage, and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of the loss; that parties thereto shall pay the appraisers, respectively, selected by them and shall bear equally the expense of the appraisal and umpire. The fees of any appraiser or umpire shall in no case exceed ten dollars( a day." It is conceded the statutory fee is $10 per day for the um-¬ pire and each of the appraisers.

Von Kuster's deposition was taken by the plaintiffs. He testified that at the time he was appointed umpire he was a stockholder and director, and for eleven years had been secretary and treasurer, of the David C. Bell Investment Company of Minneapolis, which was engaged in the business of mortgage loans, real estate, and all branches of insurance, fire, accident and liability, and acting as agents for insurance companies. The company does not act as agent, but individuals, officers of the company, act as agents; and the company receives the commissions or premiums paid to the individuals for their services. Von Kuster was appointed umpire on April 27, 1921. The David C. Bell Investment Company became the agent for the Firemen's Insurance Company of Newark, New Jersey, about April 14, 1921, sometime before he was appointed umpire. The Bell Company was not appointed as agent, but three individuals connected with it became agents for the insurance company and are still its agents. Witness had nothing to do with procuring those appointments, nor with the insurance business. The employees of the Bell Company represent five other insurance companies. Their licenses are issued March 1st of each year. At the time Von Kuster's appointment was made he knew of the appointment of the three employees of the Bell Company; he denied that the company in which he was interested was virtually an agent of the Firemen's Insurance Company of Newark at the time he qualified as an appraiser. That he did not disclose to anyone connected with the insured that any individuals representing the David C. Bell Investment Company were agents of the Firemen's Insurance Company of Newark until his deposition was taken in Minneapolis, May 22, 1925. That the Firemen's Insurance Company of Newark was interested in that arbitration.

Mr. Trevor, the appraiser appointed by the insurance companies, was a wholesale furniture dealer in Minneapolis. His deposition was taken by the plaintiff in Minneapolis, but on the request of defendant's counsel, he attended the trial and the plaintiffs put him on the witness stand to prove that he was not an impartial arbitrator. He testified that two or three days (?) after the fire he was asked by a representative of the Western Adjustment Bureau to appraise or estimate the loss and damage from the fire which occurred February 13, 1921; that he went to the scene of the fire to determine if he could

qualify as an appraiser or estimator; he was wanted as an appraiser. That he there met a Mr. Wallblum and Mr. Smith, representatives of the insurance companies, and the watchman of the building. He had not then been appointed as an appraiser or estimator. That Messrs. Wallblum, Turgeon, and Smith appeared before the appraisers as witnesses for the insurance companies. A Mr. Turgeon was there on one of the occasions when the witness went to the building. That he did not make a tour of the building with any of the persons he named. He denied that he told either of the persons he saw at the building that he expected to be appointed an appraiser. He was asked to refresh his memory; if he did not state in his deposition that he had told the gentlemen he saw at the building that he expected to be appointed appraiser on the loss and damage. To which he answered: "I think I did when they started to ask me questions." The witness stated that the reading to him of the portions of his deposition did not refresh his memory as to what took place at that time. The witness further stated that he had acted as an appraiser for the Western Adjustment Bureau during a period of ten or fifteen years; that he could not estimate the time. When asked if he did not state in his deposition, from which counsel read, that "as a matter of fact he had served as appraiser for insurance companies to such an extent and so frequently that he expected the insured's estimates to be generally exaggerated," to which he replied that he remembered the question, and that his answer was as stated in the deposition, and that, as a rule, that would be his answer now. This witness, after describing the course pursued by the appraisers in reaching their conclusion, testified that he was paid for his services in this matter, $625, by the insurance companies; that Mansfield, one of the appraisers, was paid $500 by the assured; and that the umpire was paid by both parties. That he had never told anyone he got .$2500 for his services in this matter; that in his determination of the loss he was governed solely by the evidence and sought to give these parties a fair and reasonable award for their loss and damage uninfluenced by any extraneous circumstances. Finally, after a lengthy additional examination by both parties, the witness stated that the people that testified in opposition to the correctness of the schedules of the valuation of the property were the witnesses for the insurance companies, viz., Messrs. Wallblum, Smith and Turgeon; that he was not able from his own information to determine whether these schedules were correct or not, and that he relied on the testimony of the witnesses for the insurance companies to convince him that the schedules were correct.

There was testimony for the plaintiffs that a few days after this fire, Trevor, Cobben, an insurance adjuster, and Wallblum and Smith, representing the insurance companies, were at the scene of the fire;

that Trevor got a lantern from the watchman and they went through the rooms of the hotel, looked over the furniture and each had a list and was writing, and that they left and went to Turgeon's store, and that these persons testified before the appraisers for the insurance companies as to the extent of the loss. One Colin J. Chisholm testified that during the hearing before the appraisers he met Trevor at a restaurant and that the latter ridiculed the prices that were put on the furniture, saying that Barnard Brothers & Cope made those wardrobes and they cost from $12.50 to $15, to which Chisholm says he replied: ''I wish you would buy a few for me at those prices.''

A Mr. Mack testified he saw Trevor after the award had been made; this was at the New England Carpet & Furniture Company's store. Trevor asked him if he had received his compensation for estimating the loss; that he (Trevor) had already been compensated. ''I believe he said he had received 'about 2500 and some odd dollars.' ''

Harry G. Rodenberg, one of the plaintiffs, testified that near the end of the hearing he accompanied the appraisers on their tour through the building; that Trevor pulled out a dresser drawer and the glue joints were all opened up. Trevor said to Von Kuster: ''That was caused from general wear of the furniture, and was not caused from smoke or fire.'' The condition of the furniture before the fire was good; the glue joints were not open before that time. After the fire it was in bad condition. Parts of the dressers and wardrobes were burnt, and tables and chairs; that the finish was taken off and the glue joints were opened up. You could pull a drawer out of a dresser and the whole thing would fall to pieces.

Von Kuster testified that during the hearing Trevor said he had seen the goods there in the hotel; that he had been asked by the company shortly after this fire to go down and make the appraisal. He said nothing about the value. He spoke about the fact that the main part of the building was well burnt out and the goods in the annex were smoked up and dirty as the result of the smoke. Witness testified that when the appraisers were at the building he (Trevor) spoke about the fact that he knew all about these mattresses and knew what they were worth and their quality; ''I believe;'' says the witness, ''he named a price less than the price put on them by the witnesses for the insured during the time we were making our computation.''

John A. Mansfield testified that Trevor said he had been down through the property and examined it shortly after the fire, on several occasions and before the appraisal, and that he knew the extent of the damages.

It was admitted at the hearing before the appraisers that ''the furniture was in good condition before the fire.'' There is much more evidence tending to show the bias, prejudice and partiality of Trevor as an appraiser, but enough has been stated to sustain that

conclusion with the unbiased mind. The contention of appellant's counsel that there is no evidence justifying the setting aside of the award of the appraisers that rendered it necessary in demonstrating the incorrectness of this conclusion to make a somewhat lengthy statement of the facts.

I. The duties of these appraisers were that they should stand indifferent between the parties. If they did not so stand their appraisal should not be upheld. Chief Justice MARSHALL, as a member of the Virginia Constitutional Convention of 1830, in the discussion of a question apposite to that under review, said: "You do not allow a man to perform the duties of a juryman or judge if he has one dollar of interest in the matter to be decided."

In Hyeronimus v. Allison, 52 Mo. 102, 104, Judge SHERWOOD said: "If the mind of an arbitrator be tainted by partiality, he manifestly would be guilty of a *gross fraud* in concealing such bias, of which he must be conscious at the time he is chosen. A court of equity, which narrowly watches every appearance of unfair dealing and repudiates every transaction which bears the dark impress of fraud, would be recreant to the principles on which its very jurisdiction rests to permit an award made under such circumstances to stand." See also Sholz v. Mills, 176 Mo. App. 352, 158 S. W. 696, and Pac. Lime & Gypsum Co. v. Missouri Bridge & Iron Co., 286 Mo. 119, 286 S. W. 853.

In 26 Corpus Juris, page 419, Section 549, it is said: "While the usual provisions in a policy for appraisement or arbitration require the appointment of one appraiser or arbitrator by each party and the selection of an umpire by the two in the event that they cannot agree, nevertheless it is contemplated that the persons appointed by the parties be impartial and disinterested. To be disinterested they should not only be without pecuniary interest in the result, but also without bias or prejudice. A person who is frequently or habitually employed by insurers as an appraiser and who by his conduct makes it clear that he understands that he is acting in their interests is not disinterested. But the fact that one has acted in the same capacity on other occasions does not necessarily disqualify him." [Harmon v. Stuyvesant Ins. Co., 170 Mo. App. 309, 156 S. W. 87.]

26 Corpus Juris, page 421, Section 551, is to the effect that "an arbitrator or appraiser is bound to exercise the highest degree of judicial impartiality, without the slightest regard to the manner in which the duty devolved upon him. He is not the agent or advocate of the party selecting him. He is, however, supposed and expected in a restricted sense to represent such party, and, within reasonable limits, to see that no legitimate consideration favorable to him is over-

looked." [Fowble v. Phoenix Ins. Co., 106 Mo. App. 527, 81 S. W. 85.]

Within a few days after the loss Trevor went twice to the burned buildings and made an *ex parte* examination at the request of a representative of the insurance companies to see if he could qualify as an appraiser or estimator. Here we must read between the lines. He must have reported the result of this examination and that report was satisfactory and demonstrated that he was qualified. He was chosen as appraiser by the insurance companies. There is much evidence that Trevor made this inspection in company with several others who testified before the appraisers as to the loss and damage caused by the fire. It seems from Trevor's evidence he based his valuation largely on the estimates of these witnesses and rejected the valuations by plaintiffs' witnesses; some of them, at least, he regarded as ridiculous. While going through the burned buildings with the other appraisers he told them that the loosened conditions of the glue joints of a dresser was caused by wear and not by the fire; this, in the face of the admission that the furniture was in good condition before the fire. During a period of thirty-five years he had served as appraiser for insurance companies; so frequently, he could not remember the number of times. His experience was such that he expected the claims for damages (which the policy in this case required to be in writing and under oath) to be exaggerated. The hearing occupied two weeks. At the conclusion, on the suggestion of Mr. Mansfield, one of the appraisers, Trevor says he took the numerous exhibits and went over the entire thing, including the testimony of all the witnesses (note that there were twenty-five or thirty witnesses and that their testimony, taken in shorthand, had not been typewritten), to determine their credibility and their knowledge of the exact amount of loss and damage, replacement and values. His conclusions on the loss and damage to the goods and replacement value was accepted by Mansfield and Von Kuster. For this performance of his duties, no doubt eminently satisfactory to the insurance companies, they paid him $625, which was at the rate of $25 per day, while the policy and the statute of Minnesota limited his fees to $10 per day. Mr. Mack, who had been in the furniture business in Minneapolis twenty years, testified that Trevor told him he received $2500 compensation for his services as appraiser in this case. Although Trevor's deposition had been taken by the plaintiffs, he voluntarily left his business 700 miles distant and came to St. Louis at the defendants' request to testify at the trial. As we have seen, his oral testimony was at a variance with his deposition. On a consideration of all his testimony there is room to doubt whether he (Trevor) was a fair, candid, impartial and disinterested appraiser and the finding of the learned trial court in that respect is supported by the great weight of the evidence.

Human nature has its limitations. "No man can serve two masters; for either he will hate the one and love the other, or else he will hold to the one and despise the other." When the Ethiopian can change his skin or the leopard his spots, we may safely remove the disqualifications of judges and jurors on the ground of preconceived opinion, interest, bias and prejudice. That Trevor had a preconceived opinion on the merits of the case is demonstrated by the evidence.

The fairness and impartiality of an appraiser should be, like that of a juror, not only above reproach, but above suspicion. Trevor's *ex parte* examination at the request of the insurance company to see if he could qualify as an appraiser and his subsequent appointment as such is to the impartial mind, when most conservatively expressed, a suspicious circumstance. [Mason v. Insurance Co., 258 S. W. (Mo. App.) l. c. 762.] His receipt of an excessive fee in violation of the statute law and of the terms of the policy, in connection with other circumstances in the case, are persuasive evidence that he was the paid agent of the companies. "A person who is frequently or habitually employed by insurers as an appraiser and who, by his conduct, makes it clear that he understands that he is acting in their interests is not disinterested." [26 C. J., p. 420, sec. 549, n. 38.]

The sifting of the evidence, the determination of its weight and credibility, and of the extent of the loss and damage as estimated by Trevor, alone, which he says occupied five or ten evenings of his time, were wholly *ex parte* and hence nugatory. The policy, by its express terms, required that "the appraisers together shall then estimate and appraise the loss." "Since an appraisement gets its entire force from the joint act of the parties through their agents, where it is *ex parte* it goes for naught, and it is no evidence at all, either on a motion for a judgment or at the trial." [Penn. Plate Glass Co. v. Spring Garden Ins. Co., 189 Pa. 255; 26 C. J. 425.] "While an appraisement proceeding need not be conducted with the formalities of a trial, nor with the strictness required in a common-law arbitration, there must, nevertheless, be a fair effort on the part of the appraisers to ascertain the truth, and a consideration of available information, and a deliberate judgment of those making the award, after due consultation and deliberation." [Paint Co. v. Aetna Ins. Co., 165 Mo. App. 30; 26 C. J. 422, par. 557.]

But Mr. Trevor and Mr. Von Kuster, notwithstanding the foregoing facts, solemnly testified that the entire proceeding was characterized by the utmost good faith and impartiality, and that the appraisers and umpire were men of integrity and high standing; that the award was justified by the evidence and was fair, impartial and righteous altogether. That the appraisers and umpire should protest their fairness and impartiality is to be expected. But in the light of the evidence this appraisement has the earmarks, to say the least, of bias and partiality, despite their protestations.

In Hamlet, Act 3, scene 2, the Prince inquired of the Queen:
"Madam, How like you this play?"
Queen: "The lady doth protest too much, me thinks."
Hamlet: "O, but she will keep her word."

A few days before the appointment of the appraisers the Firemen's Insurance Company of Newark appointed three of the officers of the David C. Bell Investment Company as agents to represent its business in Minneapolis. Straightway Mr. Von Kuster, one of the directors and stockholders, and for eleven years secretary and treasurer of the Bell Company, was appointed umpire on the solicitation of the plaintiffs and of all of the other insurance companies interested in plaintiffs' loss. The commissions of these agents of the Firemen's Insurance Company earned in the business were part of the profits and emoluments of the Bell Investment Company, part of which inured to Von Kuster's benefit. Why were these appointments made at this strategic moment? And why were they so closely followed by Von Kuster's appointment as umpire? In the light of the facts the craftiness of this subtle scheme is apparent; the voice was the voice of Jacob, but the hand was the hand of Esau. It is too transparent to deceive anyone knowing the facts. But the facts were unknown to the plaintiffs. Von Kuster may be acquitted of any wrongful intent, yet he knew of the relation of his company to the insurance company at the time of his appointment. Unquestionably his interest and relation to his principal would have disqualified him as a juror in an action on the policy.

"Either party had the right to demand that the arbitrators chosen should have the competency of jurors, and assuredly a litigant cannot be expected to consent that his case shall be tried by his antagonist in person or by agent." [Goodwin v. Ins. Co., 118 Iowa, 601.]

"It is well said that the word 'disinterested' does not refer merely to those cases where there is a lack of pecuniary interest, but is used in the broader sense, as meaning not only that there must be a lack of pecuniary interest but also that the person must be unprejudiced and without bias." [5 Joyce on Insurance, sec. 3242.]

A recapitulation of the vitally material facts will confirm our conclusions as to the correctness of the finding of the trial court. *Semble:*

II. Plaintiffs bought the furniture and furnishings in the Miller Hotel in August, 1920, and paid $55,000 therefor. The hotel was in two buildings, the main or old brick building three stories high, and the annex, a five-story brick building. The first floors of these buildings were not occupied for hotel purposes, except the lobby or entrance of the hotel in the main building. With this exception the first floors were occupied by other tenants. There were sixty-six bedrooms in the main building and ninety-two in the annex. There were fifty-

six bedrooms in the main building all furnished alike, and all the bedrooms in the annex were also furnished alike. The fire was discovered in the basement about one o'clock Sunday morning, February 13, 1921. The entire fire department responded to the alarm and within a few minutes thirty-five streams of water were turned on and into the buildings. The fire was extinguished late in the afternoon. The floors of both buildings were flooded with water. The beds, mattresses, carpets, etc., were soaked with water and permeated with smoke. The main building was destroyed so that it was condemned and the walls torn down. In some of the rooms the furniture and furnishings were entirely destroyed, in other rooms they were badly damaged, and after repeated efforts the salvage was sold for $3400. Most of the plaintiffs lived in the city of St. Louis, where the suits were brought against the insurance companies issuing the policies, to set aside the award, to recover for the loss and damage in each policy. In this case the award was set aside; the court found the value of the property insured was $55,000; that the damage caused by the fire was $51,600 (the value of the property less the $3400 for which the salvage was sold) and rendered judgment for plaintiffs for $9,381.82, being defendant's proportionate share of the loss with interest.

John T. Maloney testified: "I am a hotel broker. I negotiated the sale of the equipment of the Miller Hotel by Miller and Sherman to Schwartzman Brothers & Company in August, 1920. Miller and Sherman wanted $60,000 or $65,000, but we negotiated a sale for $55,000. I thought the purchasers were making an excellent buy at that price. The fair and reasonable price was $65,000. I visited the hotel several times and was shown over the house as to the improvements Schwartzman Brothers were making. There was considerable cleaning up and other improvements. I went through the buildings after the fire. In some of the rooms the water marks on the walls showed the water up a couple of feet. It all looked pretty rotten. It was worse on the second and third floors of the annex than on the upper floors. I thought it was a total loss. There might have been some iron beds in there or mattresses that were not wet, but from a hotel man's point of view there wasn't anything of value left."

Max Schwartzman, one of the plaintiffs, testified: "I have been in the hotel business twenty years; been connected with the Marion Roe Hotel in St. Louis five years; was interested in that hotel and the Brevoort. I conducted the negotiations for the purchase of the Miller Hotel from Miller and Sherman; they were represented by Mr. Maloney. We finally agreed on $55,000. The furnishings in the main part of the building were as good as those of any hotel in this town; it was wooden furniture; most of it was solid mahogany and there was some veneer. The dressers and some of the chairs and writing desks and tables and some of the wooden beds in the main building were solid mahogany. There were some sixty rooms in that

building. In the annex we had Martin beds and felt mattresses and Way Sagless springs, a rug on the floor and a veneer mahogany dresser and chairs and writing tables. I bought the furnishings for the Brevoort and the Marion Roe. I bought all the extras for the Miller Hotel in Minneapolis. If you wanted to replace the furnishings for that hotel you could not do it for $75,000.''

Harry G. Rodenberg, one of the plaintiffs, testified: ''I lived in St. Louis before going to Minneapolis two years ago; was assistant manager of the Marion Roe Hotel for two years. We purchased the hotel furnishings and equipment of the Miller Hotel. I went as manager August 15, 1920. I was in bed when the fire broke out. The night clerk called me. The fire started in the basement. The old building was practically all burned; some of the annex was burned. In making proofs of the loss we went into the building and checkedl up the stuff. I was familiar with the contents. I made purchases for the hotel after I became manager; linen of different kinds, rugs, window shades for the entire house, beds, mattresses, new carpets, new matting for the lobby, rubber matting, electric lights, electric fixtures, wiring, etc. I replaced all articles in the hotel that had become worn or impaired by use; redecorated the entire hotel, painted the concrete floors, bathrooms and window sills, halls, and had the main building papered, and repainted a big majority of the rooms and put repairs on plumbing and electrical fixtures. Three or four days after the fire Mr. Titcomb, the insurance adjuster, and I went into every room and examined the contents and he wrote a list of same in two books as I called off the items. Thereafter Mr. Titcomb gave me a list of the contents of the rooms based on our examination. I checked it with the original copy here.'' Here witness describes the furniture substantially as described by Mr. Schwartzman and identified a schedule showing in detail the various articles in each room of both buildings and the basement which showed in separate columns the actual value of each item, loss and damage, totalling $99,196.20 actual value, and $77,532.42 loss and damage. Witness details improvements, decoration, etc., made by him at a cost of about $4,000, which is shown in the schedule, all of which items were covered by the policy of insurance and were included in the schedule.

Harry A. Titcomb, an insurance adjuster, represented plaintiffs in an attempted adjustment of the loss. With the assistance of Mr. Rodenberg, one of the plaintiffs, and Mr. Mack and Mr. Dean, buyers in the New England Furniture & Carpet Company, he made a list of items damaged and destroyed, going into each room throughout both buildings. He classified and tabulated it according to the different rooms. He divided the articles that were destroyed or obliterated and those that were not. In the old building some of the rooms and their contents were entirely destroyed; generally the items destroyed consisted of window shades, curtains, dresser covers, towels

and the like. Exact copies of this schedule were furnished to the adjusters of the insurance companies, with an estimate of the actual value and the loss and damage. The property in the annex was damaged from heat, smoke and water; and from small amounts of fire in one or two rooms. Here the witness related conditions showing that much of the furniture, beds, etc., were burned; other articles were injured, dressers, wardrobes, chairs, etc., were water-soaked and stained; glue joints were opened, mattresses, carpets, etc., were frozen solid, and covered with smoke and creosote; all of the rooms were permeated with a strong odor of smoke.

Several persons engaged in the wholesale furniture business in Minneapolis, at plaintiffs' request, a few days after the fire, spent several days in examining the furniture and furnishings in the burned buildings. Each had a copy of the schedule above referred to by Titcomb, and carefully checked over the items and considered the value of the salvage. They valued the salvage at more than it was subsequently sold for. Hans Brecher fixed the loss and damage at $58,000. Ira S. Mack, at $62,261.74. O. M. Teslow, at $50,650. Colin J. Chisholm, at $54,070.83.

Mr. Rodenberg made repeated efforts to sell the salvage and finally disposed of it for $3400. The sale included beds, springs, mattresses, dressers, tables and carpets; it did not include bedding. The purchaser testified he did not find out how bad the furniture was until after he started to take it out. It was so badly water-soaked and dried up that most of it fell to pieces. All the wardrobes went to pieces. The metal furniture was in bad shape; some of it was so twisted and badly damaged that he could not use it. "The fair and reasonable price was what we paid for it; that was the highest price they could get. The carpets were all soaked and two-thirds of it we sold for rags. I took a list of 152 dressers; when we got them to the store we had only 98; the rest had fallen to pieces. They all had to go through the shop. We have some of them yet. As to the finish on the dressers, some of it was washed off and some of it was burned off. There were some chairs, mostly scorched and in bad condition. The upholstered chairs in the lobby were in bad shape. The leather was burned off."

On the part of the defendant, O. J. Morawetz, a wholesale dealer in furniture, testified: "I have charge of the hotel furnishings for Boutell Brothers at Minneapolis. In the spring of 1921 furniture was a trifle lower than in the fall of 1920. Boutell Brothers furnished the Miller Hotel. I have the original contract under which these goods were sold. The majority and the substance of that contract was in that hotel at the time of the fire. There were 150 outfits. They were sold in 1915. The articles in the bill of sale are almost identical with those in the schedule; there are a few in the schedule not in the bill of sale, and some in the bill of sale not in

the schedule.'' The witness testified at great length; the sum of it is to the effect that the valuations in the schedules were excessive.

Peter Keith, with Cornwell and Bell Furniture dealers, and formerly with the New England Furniture & Carpet Company, testified: ''I went through all the rooms of the Miller Hotel after the fire with schedule in hand, checking it over and estimated the replacement cost at $38,241.55; that is the furnishings; the list I had did not include a lot of things I have heard mentioned here, such as linens, doors and screens. I figured from the list I had on the basis of the cash price and twenty per cent profit.'' In his testimony before the appraisers this witness testified that the actual value on the list he used before the fire was $26,552.64 and that the loss and damage was $15,834.85.

L. Turgeon, a representative of the insurance companies, inspected the premises about March 16, 1921. He stated that the annex was in very good shape, except damage by smoke and water. He placed the loss and damage on each item on the schedule; that the cost, new, as listed by the plaintiffs, was on an average of seventy-five per cent above the actual cost; he estimated the replacement value before the fire at $32,985.38.

In appellant's brief it is said: ''The testimony given at the hearing before the appraisers was offered in evidence. An examination of same will disclose that practically the same testimony, with reference to value, was given there as in the trial below, and that there was also great conflict as to the real condition of the premises after the fire.''

The evidence of L. Turgeon above set out was part of that given before the appraisers; he did not appear at the trial.

The evidence, as to the loss and damage to the insured property, is in hopeless conflict. A careful study of the record leads to the conclusion that Trevor dominated the board of appraisers and that it was he, and he alone, who weighed the evidence, determined the credibility of the witnesses, fixed the valuations and determined the loss and damages on the furniture and furnishings. In fact, that is his testimony. It is clear also that he had a preconceived opinion of the original values and of the loss and damage. During the hearing he ridiculed the valuations of and damage to some of the property as fixed by plaintiffs' witnesses.

III. In the opinion of the writer, the foregoing presentation of the facts conclusively demonstrates that the trial court did not err in finding for the plaintiffs. However, it is urged in their behalf that an underlying reason, one involving a question of jurisdiction,

exists why the appellant should not recover. It is this: the absence in the answer of any claim of excessive damages and a like absence of this contention in the motion for a new trial. The only reference in the latter, on which the ruling of the majority opinion can be based, is found in the sixth paragraph of the motion, which is as follows: "Sixth: That the court erred in finding the value of the property covered by the insurance in this case at $55,000."

This, at best, requires a construction by implication to enable it to be considered as a ground for a review of the finding of the trial court on the question of excessive damages. The difficulty encountered in such a construction is that no basis for the same can be found in the answer in which no averment appears alleging that the damages found were excessive. The ruling in the majority opinion, therefore, must rely for its support on an implied allegation in the motion for a new trial upon an issue sought to be created by such implication in the absence of any reference thereto in the pleadings. It is exceedingly elementary that appeals are purely statutory. Recognizing this fact our law-making power has provided the machinery which we call our procedure, by which the right of appeal and a hearing on the same may be had in this court. One of these monitors provides that "no exception shall be taken in an appeal or writ of error to any proceedings in the circuit court, except such as shall have been expressly decided by such court." [Sec. 1512, R. S. 1919.] The excessiveness of plaintiffs' recovery not having been made an issue, the attempted preservation of same in the motion for a new trial—even by implication—was therefore an error, and upon this error, and this alone, is based the ruling in the majority opinion. This court has frequently held that it will not consider, much less decide, an alleged error of the trial court in a matter of exception, unless the attention of the latter court was directed to the same by the motion for a new trial. Much less then can this court's right of review be invoked where the matter impliedly called to its attention has not been made an issue in the case. We have repeatedly held that inadequacy or excessiveness of a finding or verdict was a matter of exception entitled to be considered only when it has been made an issue and is specifically assigned as error in the motion for a new trial. The following cases are illustrative of this rule:

In Minton v Steele, 125 Mo. l. c. 196, this court said: "The suggestion now advanced that the plaintiff should, in no event, be allowed to recover more than a part, or an undivided share of the property, comes too late. At best it amounts to this: That plaintiff, having a right to some interest or estate in the disputed land, has recovered a larger share than he is justly entitled to, under the facts. Such an objection, in the state of the record now exhibited, amounts to noth-

ing more than that the verdict is excessive. That objection should have been made in the circuit court to be available here for review.''

In Ridenhour v. K. C. Cable Ry. Co., 102 Mo. l. c. 290, this court said: ''Something has been said upon the rehearing about the large amount of plaintiff's damages ($8500) and the intimation is thrown out that they are excessive. But as no such objection to the verdict was made in the motion for a new trial that matter is not a proper subject to review.''

In Weese v. Brown, 102 Mo. l. c. 304, this court also said: ''But to the extent of $15, at least, the verdict was fully supported by the law and the evidence. If defendant objected to the jury's assessment of $29.40 additional, as the equivalent for the cow, he should, in some way, have called the attention of the trial court, in his motion for a new trial, to the excess in the damages awarded. [Ridenhour v. Railroad, ante, p. 270.] This he did not do. None of the grounds of that motion can possibly be construed as alluding to excessive damages. So that point is not now available to defendant in this court. [Vineyard v. Matney, 68 Mo. 105.]. Had such, a ground for a new trial been assigned in the motion, plaintiff could, at once, have removed the objection by reducing the amount of the finding to $15 by *remittitur*. But, as defendant made no such objection, plaintiff, as well as the court, in the peculiar case here presented, might justly have inferred that defendant took no exception to the assessment of value of the cow.''

Aside from the rights of the litigants to have their case reviewed and determined upon appeal on the issues submitted it is, to say the least, unjust to the trial judge, sitting as a chancellor, to hold that his finding is erroneous in regard to a matter which did not constitute an issue and which was never called to his attention. The appellant made no claim that the damages found were excessive, and if excessive, as the majority opinion holds, the trial court was not invited to reduce them nor given an opportunity to do so. We have spoken in no uncertain terms on this subject.

In State ex rel. v. Farmers and Merchants Nat. Bank, 144 Mo. l. c. 386, this court said: ''A final contention is that plaintiff sued for and got judgment for a greater amount than the taxes due upon the land, but no such question is raised in the motion for a new trial, and no motion in arrest was filed. As was said in Alexander v. Relfe, 74 Mo. 495, 'Even if the damages adjudged by the circuit court were excessive, no such point was made in the motion for a new trial; no opportunity was given that court to correct the erronous excess, if any there was, and it is too late to raise the point in this court for the first time.' ''

In Union Depot Company v. C. R. I. & P. Ry. Co., 131 Mo. l. c. 311, this court said: ''We do not think the court committed error by

including in the judgment the rental up to the first of November, 1892. But even if this were error, no objection was made in the trial court to the judgment on this account, either in the motion for new trial or in the motion in arrest, and the defendant cannot now be heard to assign it here for reversal of the judgment.''

Inasmuch as the trial court never decided, or had opportunity to decide, the alleged excessiveness of the judgment, the decision in this case is in conflict with said Section 1512, Revised Statutes 1919, and the following cases: State v. Crites, 215 Mo. 91; St. Louis v. Lawton, 189 Mo. 474; Coffey v. City of Carthage, 200 Mo. 616; State v. Grant, 194 Mo. 364; St. Louis v. Annex Realty Co., 175 Mo. 63; Bollinger v. Carrier, 79 Mo. 318; Bank v. Allen, 68 Mo. 474.

As further evidence of the purpose of the appellant not to rely upon a claim of an excessive finding as a ground of error is that no reference to this matter anywhere appears in its statement of the case and in the points intended to be insisted upon in the argument as required by Section 1511, Revised Statutes 1919.

Emphasizing our recognition of this statute we adopted Rule 15, which provides: ''The brief for appellant shall distinctly allege the errors committed by the trial court and shall contain, in addition thereto (1) a fair and concise statement of the facts in the case without reiteration, statement of law or argument; (2) a statement, in numerical order, of the points relied on, with citation of authorities thereunder, and no reference will be permitted at the argument to errors not specified,'' etc.

The violation of this statute and rule in the majority opinion consists in the fact that while the opinion sustained the plaintiffs' right to a judgment, yet it adjudges the amount of the plaintiffs' recovery to be excessive and this in the absence of any issue to that effect in the pleadings or (except as stated) in the motion for a new trial or in the appellant's brief.

It need scarcely be stated to any one familiar with our appellate procedure, that Section 1511 and Rule 15, supra, are mandatory and a compliance therewith is a prerequisite to a hearing upon appeal. Their observance is of such importance that we have held that they cannot be waived by the consent of the parties. [Hays v. Foos, 223 Mo. 421; Disse v. Frank, 52 Mo. 551.]

In recognition of this statute (Sec. 1511) and of our Rule 15 this court has affirmed judgments or dismissed appeals in numerous cases because of the absence of a statement of the points intended to be insisted on in argument or because of a defective statement of said points, as will be seen from the following cases: Hughes v. Winkleman, 243 Mo. 81; Bank v. Hutton, 224 Mo. 1. c. 53; State v. Boehm, 184 Mo. 1. c. 209; Sullivan v. Holbrook, 211 Mo. 99; Rusch v. Valle, 237 S. W. 111; Frick v. Millers National Ins. Co., 279 Mo. 156; Vahldick v. Vahldick, 264 Mo. 529; State v. Barker, 242 S. W. 405;

1120

Christine v. Luyties, 280 Mo. l. c. 431; Hays v. McLaughlin, 217 S. W. 264; Hanchett Bond Co. v. Palm, 220 S. W. 673; Coe v. Greenley, 295 Mo. 664; Hutson v. Allen, 236 Mo. 645.

The majority opinion rules adversely to and disallows each one of the seven points relied upon by the appellant for a reversal in his "Points and Authorities." These must be taken to represent, under the statute and Rule 15, the "points intended to be insisted on in argument." Only these could legitimately be considered. The majority opinion, however, instead of thus limiting its review, proceeded, in effect, to cast aside these rulings in the plaintiffs' favor and reversed the case on the ground of an excessive finding. This holding in the face of the record, the statutes and the rule of this court, cannot be otherwise characterized than as *sua sponte* in that it was made in disregard of all the limitations provided by law for the review and determination of cases upon appeal. The judgment of the trial court should therefore have been affirmed.