AMOS ORR, Appellant, v. FARMERS MUTUAL HAIL INSURANCE COMPANY OF MISSOURI, a Corporation.—No. 39961.—201 S. W. (2d) 952.

Division Two, April 21, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, May 12, 1947.

*Edward F. Sharp* for appellant.

374

*Alexander, Ausmus & Harris* and *Ward & Reeves* for respondent.

WESTHUES, C.—Amos Orr obtained a verdict in the Circuit Court of New Madrid County, Missouri, in the sum of $13,333.33 against the defendant, Farmers Mutual Hail Insurance Company of Missouri. The suit was based on an insurance policy insuring Orr's cotton crop against loss by hail. The trial court sustained defendant's

motion for a new trial assigning as grounds therefor the giving of an instruction. Plaintiff perfected an appeal to this court.

Respondent filed a motion to dismiss the appeal alleging that appellant failed to make a fair and concise statement of the case, omitted facts and failed to specify pages of the transcript showing evidence in support of the statements made. We have examined the statement carefully and find it sufficient to present the questions to be decided on this appeal. We also find a number of references to pages in the transcript. Perhaps the statement could have been more specific but its deficiencies do not justify a dismissal of the appeal.

Since respondent is of the opinion that appellant's statement is unfair we have concluded to take respondent's statement of facts as our own, adding thereto what we deem necessary. It reads as follows:

"On May 4, 1945, Respondent insured plaintiff's cotton crop consisting of 200 acres against loss by hail not to exceed $100 per acre. The policy provided that in the event of loss that 'in case of disagreement either as to whether there is any loss at all or as to the amount of the loss, it shall be settled by arbitration as follows: The Company shall choose an arbitrator and the assured one and the two thus chosen shall select a third and an award signed by all the arbitrators shall be final and binding upon both parties.'

"On or about the night of June 7th and 8th, 1945, a hail storm struck appellant's cotton crop. Sometime after the hailstorm representatives of Respondent called on Appellant and in the discussion of the loss asked appellant if he wanted an arbitration and appellant stated that he did. Several days later an agreement was entered into to adjust the loss by arbitration or appraisement. Pursuant to said agreement appellant selected one person, Respondent selected one person and the two selected a third person.

"About June 26, 1945, the three men so selected came to Appellant's farm and on June 29, 1946, brought in an award of 'No Damage'.

"Appellant introduced evidence that Appellant's cotton crop was to a stand about May 20, 1945, and that the cotton crop was totally destroyed by hail storm on June 8, 1945.

"In connection with the so-called arbitration pursuant to the agreement respondent named one C. I. Hart as its selection, appellant named one L. A. Gilbow and the two selected one W. T. Ballard. Respondent called C. I. Hart to testify. C. I. Hart lives in Phillips Grove, Iowa, never did live in southeast Missouri and is District Manager for a Hybred Corn Company. He had done adjusting for the Respondent's company on a *per diem* basis and had been doing adjusting for them in Southeast Missouri. The witness testified that he was an independent adjuster and worked for any company that wanted his services, that he was not under a salary with any company and that he adjusted for respondent and other companies on a *per diem*

basis. The witness testified that he was experienced in adjustment work and had received training and schooling along that line. That in his training and schooling he had studied the effect of hail on various crops including cotton crops.

"When the three Hart, Gilbow and Ballard met to determine the amount of damage to plaintiff's cotton crops they did not take any testimony of witnesses and did not notify appellant when they were going to meet.

"The witness Hart states that he and the other two men Gilbow and Ballard inspected Orr Cotton crop and arrived at the conclusion that it had not been damaged by hail.

"L. A. Gilbow testified that when he and Hart and Ballard went to the Orr farm that it was impossible to tell whether or not the cotton crop had been damaged by hail or not. That he didn't agree with the other arbitrators as to the amount of the damages. The witness testified that he signed defendant's exhibit No. 2.

"At the close of all the evidence respondent filed motion for direct verdict which was overruled by the Court. The case was then submitted to the jury resulting in a verdict for appellant for the sum of $13,333.33."

We may add that when respondent's representative called on appellant after the hail storm he offered to return the premium on the insurance policy, and it was after that time that the parties agreed to arbitrate. We also desire to state the evidence disclosed, that subsequent to the hail storm and before the arbitrators viewed Orr's cotton fields, an unusual amount of rain fell in that locality and much land was overflowed.

Appellant contended at the trial, and the issue was presented by the pleadings, that the arbitrator, C. I. Hart, selected by the Insurance Company, was disqualified because of bias and prejudice. He further contended that no notice was given to Orr of the meeting of the arbitrators and no evidence heard. An instruction pertaining to whether the arbitrator, Hart, was prejudiced was given by the trial court and it is this instruction that was deemed erroneous. Respondent contended at the trial, as here, that the instruction was a comment on the evidence and prejudicially erroneous. Appellant contends the instruction was not erroneous, but that even if it be considered erroneous the award of the arbitrators was void as a matter of law and therefore the instruction was harmless error.

It may be stated here that respondent introduced no evidence except the arbitration agreement and the award of the arbitrators. This was relied upon as a complete defense to plaintiff's suit. We have come to the conclusion that appellant's point, that the award was void as a matter of law, must be sustained. Arbitrator Hart was called as a witness by plaintiff and his evidence convinces us that he was wholly disqualified to act as an arbitrator. Respondent insists that

the agreement to settle the dispute between the parties was not an agreement to arbitrate but merely an agreemnt to appraise the amount of damages. This contention is made despite the fact that the Insurance Company's contract and by-laws referred to the agreement as an arbitration. Be that as it may, the result from a legal standpoint, as we shall presently see, is the same.

C. I. Hart, selected by the Insurance Company as arbitrator or appraiser, testified. We find the following from his evidence: He lived in Phillips Grove, Iowa, and had frequently adjusted losses for insurance companies. He had worked in that capacity for the Farmers Mutual Insurance Company of Iowa and was a personal friend of officers of the company. This Iowa company, which reinsured policies written by the defendant company, asked Hart to go to Missouri for the purpose of adjusting losses for the defendant. He was engaged in that work during the months of May and June, 1945. As an arbitrator in this case Hart was paid $14.00 for two days' work. This was taxed equally against plaintiff and defendant. The defendant company also paid Hart $12.00 per day for those same two days. He was actually in the employ of the defendant at the very time he was acting as an arbitrator. His explanation for drawing pay from two sources was as follows:

"I conducted the arbitration and worked the balance of the day and I presume the company thought I was entitled to the regular rate of pay."

The statement of the witness, "I conducted the arbitration," may have been an inadvertence, but as we shall see later it was literally true. If there is any doubt whether the above facts disqualify Hart as an arbitrator or appraiser that doubt will be removed when the process by which the arbitrators determined the award is revealed. Mr. Hart was asked why the arbitrators did not notify Mr. Orr and give him an opportunity to present his evidence. The examination shows the following:

"Q. You didn't notify Mr. Orr that at any time or place you would receive testimony as to this loss? A. No, sir.

"Q. In fact you didn't talk to Mr. Orr at all? A. I just met him.

"Q. And the only evidence you arbitrators took was that furnished you by the Farmers Mutual Hail Insurance Company? A. Yes, sir.

"Q. And that was a statement made out by them—they gave that statement to you? A. I don't know but some of the district men at Sikeston—I don't remember just who.

"Q. You had been staying at Sikeston with Mr. Harden and these other insurance men for some time? A. Yes, sir."

Mr. Harden, mentioned in the evidence, was the representative of the defendant company and it was he who offered to return the premium to Mr. Orr. Mr. Hart claimed to be an expert on the sub-

ject of ascertaining the amounts of loss sustained by hail storms. Note his evidence as to that:

"Q. What training have you had? A. Well before any adjuster works very long he generally works in connection with experienced adjusters for two or three years and in addition to that we have schooling some time at Des Moines and in that way we are trained to be accurate judges of hail losses."

It may seem strange that the other arbitrators signed the award of no damages in view of the fact that many witnesses testified plaintiff's cotton was damaged by the hail to such an extent that it was not worth working out. One of the appraisers testified as follows:

"Q. Well, what did you find out there, Mr. Gilbow? A. Well we just found where it looked like there had been some cotton. Of course this hail, if it was the hail, hit it, we was about three weeks behind the hail and between the times we had a big water over it for about twelve or fifteen days and the cotton what was there was just little dead stems was all you could find.

"Q. Could you tell from examining the ground there what had happened to the cotton? A. No, sir—not any more than the dead cotton. Of course you could tell there had been water over it, but you couldn't tell about anything else."

In the face of that evidence he signed the award of no damages. The reason for this may be surmised when we examine the record and see the theory of the defendant which was evidencely shared by Mr. Hart. One of plaintiff's witnesses was cross-examined as follows:

"Q. Now, did you have any rain with this hail storm? A. Yes, sir.

"Q. That was a heavy rain? A. Well, tolerable heavy.

"Q. Was there any surface water standing there the next day? A. Some, yes sir.

"Q. Did any of this land over-flow from water from any other cause after that? A. Well, yes about twenty-five or thirty acres ▮▮▮▮ over-flowed by back water on the south end of the place."

Plaintiff's attorney then asked a question and the following occurred:

"Q. That was after the hail storm? A. Yes, sir.

"Mr. Sharp: We now move that all this testimony regarding the flood waters covering the twenty five to thirty acres, being after the hail storm, be stricken and the jury instructed to disregard it.

"Court: I think so, if it was after the date alleged in the petition.

"Mr. Reeves: Surely that testimony would enter into the measure of damages.

"Court: That may be right, Mr. Sharp. I will overrule your motion.

"Mr. Sharp: You mean you are overruling my motion to strike.

"Court: Yes, sir."

Other witnesses were asked about excessive rains which occurred after the hail storm. It is evident from this that the theory of the defendant was that Orr's cotton crop would have been destroyed by water even if the hail storm had not done so. Another line of questioning indicates a theory of the defendant. Plaintiff on cross-examination was asked:

"Q. Now, Mr. Bray had sold you this policy? A. Yes, sir.

"Q. And at the time you purchased this policy did you pay him any of the premium? A. I paid him $1.00.

"Q. And that was all you ever paid for that policy? A. Yes, sir."

The evidence was that plaintiff had given a note in payment of the premium and the defendant had accepted it. That Hart considered the fact of the rains damaging plaintiff's crop, if the hail had not done so, is indicated by his own evidence. Note the following:

"Q. Did you ask anybody out there about the hail damage? A. No, sir.

"Q. You just went out there and some three or four weeks after this hail and relied on what you saw out there? A. That may be true.

"Q. You didn't know whether there had been, in the meantime, any rains or storms or anything else? A. Well, it wasn't difficult to tell that."

. . .

"Q. Did you consider the Orr policy of insurance? A. No, sir.

"Q. You never even saw that, did you? A. No, sir.

"Q. How did it come that you signed and swore to a statement that says you did consider those things? A. Well, I don't think the company denies but what the insurance was effective and we had complete information as to what was contained in the policy insofar as was necessary in making up of this appraisal.

"Q. But you didn't see this policy at all? A. No, sir.

"Q. Then tell this jury why you signed a statement and swore that you did do that?

"Mr. Reeves: We object to that as this is his witness.

"COURT: Overruled.

"Mr. Reeves: Exception.

"A. Why it was my personal opinion that we had all the evidence that we needed."

It is evident that Mr. Hart was of the opinion that the only evidence the appraisers needed was that furnished by the defendant and it is not difficult to visualize that he persuaded the other arbitrators to sign the report of no damages. So when Hart testified that he conducted the arbitration he was certainly telling the truth.

Respondent in its brief, under points and authorities, as to the qualification of Hart as appraiser or arbitrator, states as follows:

''The agreement in question was a valid agreement for appraisal, is binding on appellant and respondent's motion for new trial should have been sustained.

''A. The persons selected to appraise the amount of loss were qualified and there was no showing of improper conduct.

''Schwartman v. Fire Insurance Company, 318 Mo. 1089, l. c. 1109.''

That case, decided by this court en banc, is the only one cited by respondent. We deem the case decisive against respondent's ▮▮▮▮ theory. In the majority opinion, 318 Mo. 1089, 2 S. W. (2d) 593, l. c. 594 (2, 3), we find the following comments concerning the qualifications of an appraiser:

''Even though the evidence tends to establish that no conscious or actual bias, prejudice, influence, or fraud was disclosed on the part of the umpire, yet public policy and an unconscious predilection to favor of one's interest renders an arbitrator, directly or indirectly interested in the result of the arbitration, partial, incompetent, and disqualified. It is evident from what we have said that the appraisal was void and of no effect, thus obviating the necessity of considering the competency of defendant's appraiser.''

In that case an appraiser had been selected by the insurance company, another by the policyholder and a third by a court. It was the appraiser appointed by the court, referred to as an umpire, that this court in its majority opinion held disqualified because he was indirectly interested in the case. The majority opinion did not pass on the equalification of the appraiser selected by the insurance company. Respondent, however, cites the dissenting opinion as authority. As we view the situation, this court did not disagree as to the qualification of the appraisers. The disagreement was on another point. In the dissenting opinion, 2 S. W. (2d) 593, l. c. 602, cited by respondent, we find the following concerning the qualification of an appraiser:

''The fairness and impartiality of an appraiser should be, like that of a juror, not only above reproach, but above suspicion. Trevor's ex parte examination at the request of the insurance company to see if he could qualify as an appraiser and his subsequent appointment as such is to the impartial mind, when most conservatively expressed, a suspicious circumstance. Mason v. Insurance Co. (Mo. App.), 258 S. W. loc. cit. 762. His receipt of an excessive fee in violation of the statute law and of the terms of the policy, in connection with other circumstances in the case, are persuasive evidence that he was the paid agent of the companies. 'A person who is frequently or habitually employed by insurers as an appraiser and who, by his conduct, makes it clear that he understands that he is acting in their interests is not disinterested.' 26 C. J. 420, sec. 549, n. 38.''

In 6 C. J. S. 196, sec. 55, we find the following:

"Proceedings by or before arbitrators are generally not governed by, and need not conform to, the technical rules applicable to regular judicial or court proceedings. The only restrictions are that they must be fair and impartial, and in accordance with the terms of the submission and controlling statutes."

So we find the law well settled that when parties sign agreements to submit their differences to arbitration, or to determine the amount of loss by appraisement, the persons selected as arbitrators or appraisers must not be interested, biased or prejudiced. See authorities cited above and also 3 Am. Jur., page 918, sec. 89, and cases cited in support of the text. Also 6 C. J. S., page 186, sec. 46, sub. sec. (b), and cases there cited. Plaintiff testified that he did not know Hart. When asked if he knew at the time Hart was selected that he was an insurance adjuster and had been working for the defendant, the defendant objected and the objection was sustained. It is, therefore, evident that plaintiff did not know Hart's business connections with the defendant company. Viewing the situation from any angle it is plain that the award of the arbitrators in this case was void as a matter of law.

■ Numerous witnesses testified that plaintiff's cotton crop was in good condition the day before the hail storm, but that the day thereafter it was not worth cultivating because the hail had stripped most of the leaves from the stems. The only evidence to the contrary was that of Hart, who saw the fields three weeks after the hail storm. However, he did not say the cotton was not ruined but restricted his answer to stating that the crop had not been damaged by hail. He did not explain just how, three weeks after the hail storm occurred, he was able to judge that the hail did not damage the crop. Neither did he explain how his schooling on that subject aided him in so determining. The evidence amply supports the verdict of the jury that the cotton was completely destroyed by the hail storm.

■ ■ Respondent makes the contention that instruction number one was erroneous and prejudicial because it discredited Hart's evidence with reference to plaintiff's crop being damaged by hail. In the first place the instruction referred solely to and was restricted to the question of Hart's qualification as an arbitrator; second, at the trial defendant made no mention of this contention in his objections to this instruction. The point must be ruled against respondent.

■ It follows that the cause must be remanded to the trial court with directions to set aside the order granting a new trial, to reinstate the verdict of the jury and to enter judgment thereon in plaintiff's favor in the amount of the verdict as of the date of its rendition. It is so ordered. *Bohling* and *Barrett*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.