MARGUERITE PERKINS, APPELLANT, v. BENJAMIN PERKINS, RESPONDENT.—157 S. W. (2d) 253.

St. Louis Court of Appeals. Opinion filed January 6, 1942.

Motion for rehearing overruled January 20, 1942.

Petition for Writ of Certiorari denied March 10, 1942.

*Walter Stillwell* and *Ben Ely* for respondent.

 

*Roy. Hamlin* for appellant.

McCULLEN, J.—This is a suit for separate maintenance instituted by Marguerite Perkins as plaintiff against her husband. After a trial, the court rendered a finding and judgment in favor of defendant and against plaintiff. Plaintiff duly appealed to this court.

Plaintiff's petition alleged that she married defendant on May 28, 1938, in Marion County, Missouri; that she continued to live with defendant as his wife from the date of the marriage until May 2, 1940, during which time she faithfully demeaned herself and discharged all of her duties as his wife; that on May 2, 1940, defendant, without any cause whatever, abandoned and deserted her, and has failed and refused to contribute to her support; that defendant is an able-bodied man, has permanent and regular employment, making about $200 per month; that plaintiff is a resident of the City of Hannibal, Marion County, Missouri, and had resided within this State for one whole year and more next before the filing of the petition. Plaintiff prayed that defendant be ordered to pay her a reasonable sum each month for her support and maintenance, and for a reasonable sum as attorney's fees.

The answer of defendant was a general denial.

The evidence shows that the parties were married at the time alleged in plaintiff's petition; that they separated on May 2, 1940, and that until the separation they lived in a home owned by plaintiff. It is conceded that after the separation defendant paid nothing toward the support and maintenance of plaintiff, defendant's contention both at the trial and in this court being that he had not abandoned plaintiff within the meaning of the law, but that the separation was caused by the misconduct of plaintiff and was not only consented to by her but happened as a result of her request and express direction.

Plaintiff testified that, prior to her marriage to defendant, he had been married to two other women, and by such former marriages had three daughters; that, about a year after their marriage, defendant brought into their home to live with them one of his daughters, Dorothy White; that Dorothy was married and had been separated from her husband and her baby, although she had not been divorced; that a few months after Dorothy came to live in the home of plaintiff and defendant, said daughters of defendant began to have dates with two different men. It appears that one of the men was named Smith and the other Priest; that Smith was about thirty-five years of age and had been a married man but was divorced. Dorothy at that time was about nineteen years of age. The evidence on behalf of both plaintiff and defendant shows that plaintiff strongly objected to de-

fendant's said married daughter having men company come to visit her in the home; that plaintiff protested to defendant, her husband, against permitting such visits. Plaintiff testified that defendant did nothing to stop his daughter from receiving such visits, and refused to do anything about the matter; that defendant became angry because of plaintiff's protests against Dorothy's said conduct, and that defendant and Dorothy left the home and moved into a residence of their own; that the home in which plaintiff and defendant had been living prior to the separation belonged to plaintiff; that plaintiff and defendant had borrowed $500 on the home, which had been used in part payment on an automobile purchased by defendant, the title to which was taken in his own name; that the amount of said loan still constituted a lien against plaintiff's property at the time of the trial.

Plaintiff testified that she and defendant got along fine before Dorothy came into their home; that about three or four months after Dorothy came to their home, she (plaintiff) and defendant began to have quarrels over Dorothy's men visitors. Plaintiff described how telephone calls would come into the home at different hours of the day and night for Dorothy; that taxicabs would pull up to the home at different hours of the night; that defendant had a younger daughter by a former marriage, whose name was Evelyn; that Evelyn was living with her mother, defendant's former wife, but came at regular intervals to visit in the home of plaintiff and defendant. Plaintiff further testified that she had talked to defendant about the youngest daughter Evelyn; that, on the date that defendant separated from plaintiff, plaintiff had told defendant that Evelyn had been picked up by the police for running away, and that plaintiff had asked defendant on other occasions to look after Evelyn to prevent the girl from getting into trouble because she said she liked Evelyn. On cross-examination plaintiff testified:

"Q. You stated that your objections to Dorothy were that men would come there to your home? A. They did.

. . . . . . .

"Q. Nothing was wrong while you were there, was there, Mrs. Perkins? A. I objected to the language the men would use toward Dorothy in my home.

"Q. Did you tell them about it? A. I told her about it.

"Q. You didn't tell them about it? A. It was Harry's right to do that.

"Q. Did you tell Harry about it? A. Yes, sir.

"Q. What did Harry say? A. Nothing."

Lonnie Cunningham, husband of a third daughter of defendant (not involved herein) testified, as a witness for defendant, that he had a conversation with plaintiff in which plaintiff said "that she was going to run them all away and that she was going to rent her

own house.'' The witness was asked: ''Q. Going to run who away?'' and answered: ''Mr. Perkins, Dorothy and Evelyn, and she was going to dispose of her furniture and rent her home and make him support her.'' This witness had lived with his two children in the home of plaintiff and defendant for a period of three weeks several months before they separated. He testified, on cross-examination, that during that time ''they seemed to be treating one another as well as anyone would;'' that he ''didn't see a thing out of the way.''

Defendant's daughter Dorothy testified that she had separated from her husband prior to the time she went to live with plaintiff and defendant; that while she lived in their home, two men, who were old friends of hers, called upon her occasionally; that sometimes she went out with them in the evening to such places as theatres, but that she did not keep company with either of said men. The witness testified that on several occasions she was absent from her father's home all night, but that on those occasions her father knew where she was, and that she had spent the night with Virginia Smallwood, a girl friend. There was testimony by defendant's daughter Dorothy and Virginia Smallwood, her girl friend, to the effect that sometime in the spring of 1940, before plaintiff and defendant separated, they overheard plaintiff say that she was going to run defendant and the girls away. Defendant and his 'daughter Dorothy further testified that on a number of occasions in the home, plaintiff called both of defendant's daughters Dorothy and Evelyn prostitutes.

Defendant testified that on the date he left plaintiff she told him that she was going to rent out the place, break up housekeeping, and that she was going to make him support her; that on that day she told him to get out and to take his daughters with him and stay out; that she was going to break up housekeeping. Defendant further testified that at that time plaintiff went ''to striking at me with this glass and told me I had to go and I left.'' On cross-examination defendant testified that, prior to the time his daughter Dorothy came into their home, he and plaintiff got along ''all right.'' In this connection defendant testified:

''Q. And you got along all right then up to what time, Mr. Perkins? A. Well, we got along pretty good up until Dorothy came home.

''Q. That was in January, 1939, wasn't it? A. Yes, sir.

''Q. Harry, what I am getting at is this, as long as some of these children weren't around, you and your wife got along all right? A. Very well, yes.

''Q. After Dorothy came there was some trouble started, is that correct? A. Yes, sir.''

Defendant further testified that his wife told him that his daughter Dorothy was having men friends come to the house and that she (plaintiff) objected to it. He testified:

"Q. And she asked you to do something about it, didn't she? A. Yes, sir.

"Q. Well, what did you do about it after your wife asked you to do something about is? A. I asked Dorothy if she was doing anything wrong, by having them come there and not to do it, and she said, 'Dad, I am not doing anything wrong.'

"Q. She admitted she was having somebody, boys or men, come to see her there in the home, is that right? A. Yes, there was somebody there what for I don't know.

"Q. And that was all you did about it after Mrs. Perkins made complaint about it to you? A. I told Dorothy not to ever do anything wrong."

Defendant's daughters Dorothy and Evelyn testified that plaintiff objected to her husband spending so much money on his daughter Evelyn, saying that she as his wife ought to come first.

Mrs. Virginia Stoffer testified, on behalf of defendant, that her maiden name was Virginia Smallwood; that she knew defendant's daughters Dorothy and Evelyn; that, in the early part of the year 1940, she visited the home of plaintiff and defendant. In connection with that visit, the witness testified:

"Q. What, if anything, at that time and place, did you hear Mrs. Perkins say about her two stepdaughters and her husband? A. Well, she said, 'those damn little whores, I am going to get rid of both of them pretty soon, and Harry too.'

"Q. Referring to her husband? A. Yes, sir."

Plaintiff in rebuttal admitted that she had called Dorothy "a whore" in the presence of defendant in the home, but denied that she had done so in the presence of others; that she based such accusation on defendant's own statement to her. She further denied that she had ever stated that she was going to run defendant and his two daughters away from the home, or anything to that effect, stating that she never did tell defendant to get out of the home but that she did tell Dorothy she wanted her to leave the home. Concerning the throwing of a glass at defendant, plaintiff testified that she had been confined to her bed at home after an operation at the hospital, and that defendant came into the bedroom and was abusing her; that he told her he was the only one working, the only one bringing anything in, and that she (plaintiff) had incurred the expense of the operation. In this connection plaintiff testified: "And he kept that up until my nerves were on edge and I tried to get up and he threw back in the bed, had his hands on my throat, and he jerked me back and I threw the glass."

Dr. J. W. Hardesty testified for plaintiff that on November 17, 1939, he performed a major operation on her at St. Elizabeth's Hospital: that she had been under his care since the operation and up to the time of the trial; that, in his opinion, she would be required to be under his care possibly two months thereafter; that his bill for serv-

ices rendered to her amounted to $144, of which no part had been paid.

There was other testimony concerning the quarrels between plaintiff and defendant, much of it being more or less repetition of what we have already presented here. We think no useful purpose would be served by setting forth here in further detail the disagreeable things that were said and done by these unhappy parties. It is unnecessary to perpetuate in this opinion any more than enough to afford a proper basis for the conclusions we have reached herein.

This action being in the nature of a suit in equity, it is the duty of this court to try the case *de novo* on the record. The general rule in such a case is that, where the evidence is conflicting and consists of oral testimony involving the credibility of witnesses, the appellate court will defer largely to the trial judge's findings of fact and will accept and follow them unless it appears to the appellate court that such findings are contrary to the weight of the evidence in the case. [Kingston v. Mitchell (Mo.), 117 S. W. (2d) 226, 229; Fessler v. Fessler, 332 Mo. 655, 60 S. W. (2d) 17, 23.] The weight of the evidence, however, does not necessarily involve the number of witnesses testifying. [Schwartzman v. London & Lancashire Fire Ins. Co., 318 Mo. 1089, 2 S. W. (2d) 593.] The same general rule as to an appellate court's duty, stated in reference to a suit for separate maintenance such as we have before us, is found in Elsey v. Elsey (Mo. App.), 297 S. W. 978, where the court said:

"The action is in its nature an equitable one, and, when a case of that character reaches the appellate court, that court is not bound by the finding of a trial court upon the evidence, and *may review the evidence and reach its own conclusion thereon without regard to the finding of the lower court*. The appellate court, however, will always defer largely to the finding of the trial court upon all facts relative to which there is a conflict in the evidence. [Klepper v. Klepper, 193 Mo. App. 46, 180 S. W. 461; Kindorf v. Kindorf, 178 Mo. App. 635, 161 S. W. 318.]" (Emphasis ours.)

The statute, Section 3376, Revised Statutes Missouri 1939 (Mo. Stat. Ann., sec. 2989, p. 5048), upon which this suit is based, provides that an action may be maintained by the wife "when the husband without good cause shall abandon his wife and refuse or neglect to maintain and provide for her . . ." The two elements, abandonment "without good cause" and "neglect or refusal to maintain and provide for her" must be proved. [Elsey v. Elsey, *supra*.]

In the case at bar it is not disputed that defendant did leave his wife and, after the separation, did not contribute anything to her support, so that the decisive question to be determined is whether or not defendant abandoned his wife "without good cause."

To constitute abandonment within the meaning of the statute, *supra*, the evidence must show that defendant wrongfully abandoned

plaintiff, or, in the language of the statute, "without good cause." [Elsey v. Elsey, *supra*; Droege v. Droege, 52 Mo. App. 84.] Furthermore, it must also have been without the consent of plaintiff. [17 Am. Jur., section 96, p. 198.]

Defendant strongly urges that we should uphold the judgment herein under the general rule of "due deference to the trial judge's decision." It would be a simple matter for this court to follow the line of procedure thus suggested. We could thereby dispose of the case in short order. Furthermore, because of our great respect for the learning and fairness of the judge who tried the case (since then gone to his final reward), the temptation to follow such a course is strong. However, with all due deference to the learned trial judge's view, it is our clear duty to weigh the evidence and to reach our own conclusions thereon and to render such judgment as we believe should have been rendered by the trial judge, regardless of whether or not it is the same conclusion that he reached. The language of our Supreme Court in Bassett v. Bassett (Mo.), 280 S. W. 430, 437, involving the marital relation, is peculiarly appropriate here: "Nevertheless, such cases as this address themselves to the conscience of the court, and if we think the result arrived at by another tribunal does not comport with our conscience in the matter, it is our bounden duty so to declare." [See also Scholl v. Scholl, 194 Mo. App. 559, 565, 185 S. W. 762, 764.]

We are of the opinion that plaintiff was entitled to a judgment for separate maintenance. Taking into consideration all the evidence adduced on behalf of both parties, we believe it fails to show that plaintiff's conduct toward her husband was such as to render his condition intolerable so as to measure up to the proof he would be required to make if he were suing plaintiff for a divorce. It is the duty of a husband to love, honor, and cherish his wife, and it cannot be said that a husband performs that duty if he knowingly permits conditions to arise and continue to exist in his home which are of such a nature as to make life in the home intolerable for a self-respecting wife. We find from the evidence herein that both plaintiff and defendant are honorable persons against whose reputations for morality and good citizenship nothing has been said. In fact, it is conceded by defendant that plaintiff was and is "a good woman of moral character." Nor is there anything to indicate that defendant is a person of other than good moral character. It is clear from the testimony of both plaintiff and defendant that they "got along fine" until defendant's young married daughter entered their home. Aside from the truth or falsity of the evidence tending to show that plaintiff called defendant's daughters the names attributed to her, we think she was clearly within her rights as a wife in her own home in asking her husband to see to it that his married daughter cease receiving men visitors in the home. It was a reasonable request and a proper

regard by defendant for the welfare of his wife, as well as for the peace and good name of the home, would have prompted him to take steps to correct the situation. As a reasonable man, he should have known that failure on his part to require his daughter, over whom plaintiff had no control or right of control, to conform to the reasonable request of plaintiff would lead to serious discord. It is true defendant testified that he spoke to his daughter Dorothy, but his own testimony shows that he took the matter very lightly. He testified:

"I asked Dorothy if she was doing anything wrong by having them come there and not to do it and she said, 'Dad, I am not doing anything wrong.'

"Q. She admitted she was having somebody, boys or men, come to see her there in the home, is that right? A. Yes, there was somebody there, what for I don't know.

"Q. And that was all you did about it after Mrs. Perkins made complaint about it to you? A. I told Dorothy not to ever do anything wrong."

The foregoing evidence shows that defendant did not rise to the requirements of the situation complained of by his wife. No doubt he was unwilling to take firm action with respect to his daughter. That attitude from his own viewpoint as a father might be excusable if his daughter were the only person concerned, but such kindly indulgence of his daughter's thoughtlessness was grossly unjust to his wife under the circumstances. He owed the duty of proper consideration for his wife's reasonable requests for peace and harmony in her home. Defendant's failure to correct the situation appears to us to have been the main cause of the unfortunate quarrelings, and to have provoked natural indignation on the part of the wife, leading her to the strong expression of her desire to have the cause of their troubles removed from her home. That plaintiff had the kindliest feelings toward her husband is evidenced by the undisputed fact that she permitted a loan to be made upon her home to enable him to purchase an automboile in his own name, the lien for which loan still remained on the home at the time of the trial. Even the son-in-law of defendant, who testified as a witness for him, said "they seemed to be treating one another as well as anyone would." It also appears from the evidence that the quarrel on the day of the separation was not the immediate cause thereof, for defendant's own evidence shows that prior to that day he and his daughter had rented a residence for the purpose of moving away from the home.

It is true there is no evidence to show that defendant's daughters did anything actually immoral. However, it was not necessary for plaintiff to prove immorality on the part of defendant's daughters to be within her rights as a wife in demanding that her husband require his married daughter to obey reasonable requirements in the home to protect its good name.

As we read this record, it seems clear that defendant, by a proper attitude toward his wife and by simple proper steps, could have put an end to their troubles at any time by requiring his married daughter either to show a proper respect for his wife's reasonable wishes in her home or to leave the home. We believe that the lack of respect exhibited toward plaintiff by defendant's married daughter, as well as defendant's failure to stand by his wife in the trying situations which were caused by said daughter's thoughtless conduct, were the major causes of provoking and bringing about the unhappy condition in the home.

In Polster v. Polster, 145 Mo. App. 606, 123 S. W. 81, which was a suit by a wife for separate maintenance under the statute involved in the case at bar, this court held that, where a husband's conduct is such as to render the wife's condition unendurable in the home, she may leave the home without forfeiting the right to maintain an action for separate maintenance against him. [See also McGrady v. McGrady, 48 Mo. App. 668; Kurz v. Kurz, 119 Mo. App. 53, 96 S. W. 242.]

We believe that the equitable principle underlying the decision in the Polster case and the other cases cited *supra* is applicable to the case at bar. If, as held in such cases, a wife may leave the home because of the husband's unendurable conduct without forfeiting her right to separate maintenance, most certainly a wife should not be denied the protection of the law where, as here, the husband leaves the home and refuses to provide for the wife and his only justification is that the wife insisted that he require his married daughter to conform to reasonable standards of proper conduct while living in their home. In this case it happens that the wife did not leave the home. She was the owner of the home, and, of course, remained in it when defendant left. Nevertheless the husband's conduct in tolerating and refusing to correct his married daughter's careless conduct in the home in spite of his wife's repeated requests therefor, and his failure to heed her numerous objections to and protests against said conduct, constituted in our opinion a continuing series of indignities which made the wife's condition intolerable and would have justified her in leaving the home had it been one provided by the defendant instead of being owned by her.

The citation of cases would not be helpful here. Each case of this nature must be decided on its own facts. We believe that mature and reasonable persons of both sexes would agree that a wife ought not to be required to endure the intolerable condition in her home that the evidence herein shows plaintiff had to contend with. True, her strong protests sometimes reflected upon defendant's daughters, but her resentment was only the natural reaction to the husband's failure and refusal to protect her against the causes of their troubles. We do not say that he deliberately intended to do injustice to his wife,

nevertheless his failure to protect her rights in her own home was as effective in making her condition intolerable as though he did intend it. Defendant should not be permitted to escape his obligation to provide for his wife because of a condition brought about by his own fault.

The other questions raised by plaintiff on this appeal need not be discussed.

It being the duty of this court to render such judgment as we think should have been rendered by the trial court, we hold that defendant abandoned plaintiff without good cause and refused to maintain and provide for her, and that she is entitled to a judgment against him.

As to the amount of payments which should be made by defendant to plaintiff for her maintenance and support, the evidence is too meager upon which to base a just judgment. Furthermore, because of the conclusion reached by the trial judge, he did not pass upon that issue at all. However, it is not necessary that the case be retried in its entirety. What we have said herein disposes of the question of defendant's liability to plaintiff for support and maintenance, which is a separable branch of the case. We see no good reason for requiring the parties to try that issue again. The only questions remaining to be decided are the amount of payments to be made by defendant to plaintiff for her support and maintenance, and for her attorney's fee, and when and how they should be made. Authority for such a disposition of the case will be found in Denny v. Guyton, 327 Mo. 1030, 40 S. W. (2d) 562, 691, for the trial of the separate issues. As to attorney's fees see Long v. Long, 78 Mo. App. 32, Behrle v. Behrle, 120 Mo. App. 677, 97 S. W. 1005, and Meredith v. Meredith (Mo. App.), 151 S. W. (2d) 536.

The judgment of the trial court is reversed and the cause remanded with directions to that court to hear and determine the issues as to the amount, manner and time of payments to be made by defendant to plaintiff for her support and maintenance and for her attorney's fee, and upon the determination of those issues, to enter judgment for plaintiff and against defendant for the payment of such reasonable amounts and at such times as may be found by the court to be justified by the evidence showing the circumstances of the parties. *Hughes, P. J.*, and *Anderson, J.*, concur.