Margaret GENAZZI (Plaintiff), Respondent,

v.

Felix M. GENAZZI (Defendant), Appellant.

No. 30473.

St. Louis Court of Appeals. Missouri.

Feb. 27, 1961.

Harold C. Ackert, St. Louis, for appellant.

Harris & Dubinsky, Irvin Dubinsky, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is a suit for separate maintenance brought by Margaret Genazzi against her husband Felix Genazzi. After a trial the court below rendered judgment in favor of plaintiff ordering defendant to pay $22.-50 per week for plaintiff's support and $15 per week for the support of the adopted child of the parties. From this judgment defendant has appealed.

Appellant on this appeal has briefed three grounds for reversal. They are: the court erred in granting plaintiff separate maintenance for the reason that (1) she failed to prove that she was abandoned by her husband; (2) she failed to prove that her husband had failed to support her, and (3) that the Court's award was excessive.

The testimony relative to the final separation of the parties is conflicting. Plaintiff testified that defendant ate dinner at home the evening of May 17, 1954, then left for a union meeting. He did not return until the following day, at which time he told plaintiff he would have to leave because he was getting threatening letters. He packed his clothes, left, and never came back.

Defendant gave the following testimony in reference to the final separation. He stated: "Well, one evening, it was on May 17th, I came home about six-thirty, and I opened the door and walked in the front door, and all my clothes was piled on the floor, and she told me to get my clothes and to get out and to leave with them, 'Gutter Trash', that she would give me a divorce, that is her exact words. * * * I got my clothes and got out. That is the last time I was ever back there."

Plaintiff and defendant were married November 27, 1947, and separated either on May 17 or May 18, 1954. They had one daughter, Susan Marie, adopted in June 1953. The daughter was six years old at the time of the trial.

Plaintiff testified that during her marriage she and her husband got along very well; that she performed all her duties as his wife; that she cooked his meals, kept the house, and did the cleaning, washing and ironing for him. She stated she prepared breakfasts for him, with the exception of the times she was hospitalized or was up all night with her daughter. She prepared lunches for him to take to work, except at Christmas and New Years, when he would eat out. Plaintiff worked for a short period after one of her operations to help her husband when they needed money. She testified her sex relations with her husband were always satisfactory and that she did not refuse her husband sex relations except when her physical condition prevented it.

Plaintiff testified that both she and her husband wanted a large family of children. In 1950 plaintiff had her tubes and ovaries removed. After the operation, and while on the way home from the hospital, plaintiff told defendant he could have a divorce if he wanted one. She was prompted to do this under the belief she had failed him, and not because she did not love him. Defendant, after reflection, said he would not do that, but that they would adopt their children. Susan Marie was thereafter adopted in June 1953. At the time of the adoption the parties had not been having marital trouble. After the adoption of Susie there was a discussion about adopting another child. This took place in January, 1954. Defendant at that time told plaintiff he would not adopt another child, and when asked the reason he would not do so said, "because, and that was it". According to plaintiff she and her husband had not been having any trouble up to that time.

Plaintiff further testified that on February 6, 1954, while on the way home from church defendant told her that he had had sexual intercourse with another woman who was under age, and stated that if this woman should become pregnant he would be held for rape. He also said he would have to get a divorce from plaintiff because he could not support two women. He told plaintiff he was not seeing the woman any more, and plaintiff told him she would

stand by him. She stated she still loved him.

The girl with whom defendant had improper relations was named Fay Bentrup. She lived on Beck Avenue. After the separation plaintiff went to Fay Bentrup's place of residence and found Fay and defendant there together. Plaintiff asked Miss Bentrup, "Did you know he was a married man and had a little baby," to which Miss Bentrup replied, "I did, and what is it to you?" Thereafter defendant drove plaintiff home in their automobile and on the way told plaintiff he was sorry. At that time plaintiff did not know the name of the girl with whom defendant was involved. Later she found out her name from Joe Schultz and Clarence Aubuchon of the International Shoe Co. In January 1955 after a baby was born to Miss Bentrup, defendant and Miss Bentrup called upon plaintiff with the baby. At that time plaintiff told Fay that defendant was still her husband and that she had no business going out with him. Fay replied that she wanted defendant; that he loved her; that plaintiff never understood him, and that he had told her how plaintiff was treating him, and threatened to kill plaintiff.

Shortly after the separation defendant filed a divorce suit against plaintiff which was later dismissed. In that suit the Court awarded plaintiff the sum of $30 per week as temporary alimony. On one occasion she did not receive the $30 that was due under this order. Plaintiff went to the Beck Avenue address to try and collect this amount. She waited for defendant to come out of the house, and when he did come out and entered a taxicab she followed him to a filling station at Pattison and Kingshighway. At that place defendant came over to plaintiff's car and threw a money order at her, and hit her in the head about six times. That same day defendant came to plaintiff's home and apologized, then got mad and got her against the wall and was going to hit her. Plaintiff's mother intervened and told him not to hit plaintiff. Defendant then went after the mother. A neighbor also intervened, and defendant told him he would hit his wife if he wanted to. The police were called but no arrests were made.

Defendant testified that he and plaintiff started having marital difficulties on the third day of their marriage while they were on their honeymoon. These difficulties related to their sexual relations. He stated that plaintiff was cold and indifferent at all times, and that during the seven years they lived together he had intercourse with her only 45 times. Plaintiff testified that they had no trouble with regard to their sex relations until the defendant started going out late at night in October 1953. She stated he never complained to her about being cold and indifferent, but in fact stated that most husbands would be glad to have a wife like her. On one occasion plaintiff did refuse to have relations with defendant. That was subsequent to the separation. At that time plaintiff told defendant that when he came back to her she would be a wife to him, but as long as he was seeing Fay Bentrup she would have no relations with him.

Defendant further testified that after the honeymoon when he told plaintiff that her mother was not supposed to live with them plaintiff flew into a rage, would argue and tell him to get a divorce and leave.

In 1950 plaintiff was under the care of Dr. Stein, who thought it would help the marriage if plaintiff and defendant would adopt a baby. Defendant testified he was against this at first, but after hearing the doctor out thought perhaps it would help. He stated that during the time the baby was in their home and they were being checked by the agency, plaintiff told him on many occasions that he had better be on his good behavior, because if he did not want the child he did not want her. He stated that after the adoption of the baby, conditions did not improve.

Defendant further testified that he was up most of the nights with the child. Plaintiff testified there was a time when Susie

was ill, due to the fact that her formula was not right for her. This covered a period of about three months, during which time the child cried night and day. Plaintiff stated that they both got up at night and at times took turns with her. Plaintiff's mother, who lived with the plaintiff and defendant, testified that she saw her daughter and defendant take care of the baby during that period. There were occasions when defendant would tell plaintiff to stay in bed. When this occurred defendant would sometimes fix his own breakfast, and times when she would do so. Defendant stated that plaintiff's mother many times got his breakfast and fixed his lunch; that he himself would fix his lunch, and that once or twice plaintiff did perform this task. He stated that after the child was adopted things got worse. Defendant further testified that the situation with respect to their sexual relations "lessened to nothing" after they adopted the child; that their marital situation was just a turmoil from day to day; that though they occupied a double bed he had practically no relations with her; that on occasions she would insist that he leave their bed; that they would go to bed and she would "start out about different things, you are running around with this girl, and you are running around with that girl, this and that, I was not getting any sleep at night, and I thought the thing to do was to get out of that bed and go to sleep on the sofa, and I have many a time, in fact, slept on the floor."

Defendant further testified that he discussed with plaintiff the matter of her coldness, and her refusal to have marital relations with him, and she replied, "Well, as far as I am concerned, you can go anywhere and have intercourse with any other woman you want to, as long as I don't know a thing about it." Plaintiff denied ever having made such statement. Defendant stated that the situation did not improve after the adoption of the child.

Defendant related one instance when plaintiff's mother came into the room where they were and inquired what was wrong, and plaintiff told her mother it was none of her business, whereupon defendant said if plaintiff would not tell, he would, and he said "I cannot even think of doing anything with your daughter at all." This shocked the mother very much and she asked plaintiff if it was the truth to which plaintiff replied, "Well, if it is, what is the difference."

Defendant further testified plaintiff told him on one occasion that Dr. Stein had another baby they could adopt, and when he suggested that, in view of what had been going on between them she should think over the matter, she replied, "Well, listen, if you don't want this child that he is offering, you don't want me, you might as well leave." Plaintiff denied making the foregoing statement.

Defendant related a conversation had with plaintiff in 1950 in which she stated she wanted a divorce, and told him he could have one if he wanted it. In this conversation she compared defendant unfavorably with two other men she went with prior to their marriage who were doing good financially, and mentioned the fact that his brother was receiving help from his mother, and wanted to know why he could not ask his mother for at least a thousand dollars as a down payment on a home. She stated she could have married those other men mentioned and would have been happy.

Defendant testified that plaintiff told him he had to quit the Crusaders Club of which he was a member, because she did not like the people in it. She had fights with members at different times. Defendant stated that plaintiff could not get along with anybody, and at times they would go to people's houses when invited and plaintiff would say, "Well, I don't know how you can go over to those people's houses, they are just trash." He stated that to plaintiff his friends were just trash; that she objected to every friend he had; and objected to his going to union meetings.

Defendant testified that plaintiff refused to permit him to take their adopted child to his parents' house, stating that his parents should come to their house, and both before and after the separation, told him if he took the child to his parents' home she would call the police and have him picked up. Plaintiff denied she ever refused defendant permission to take the child to visit his parents.

Defendant testified that during the course of their marriage plaintiff on numerous occasions charged him with associating with other women when in fact, except in the one case, he had not had improper relations with other women. He admitted having sexual intercourse with Fay Bentrup at a time antedating the separation, but could not remember the date. The incident took place in a motel in the county. He claimed he had never lived with Fay Bentrup or anyone else. He stated, however, that he did visit Fay's son regularly, sometimes three or four times a week. He does not make regular weekly payments for his son, but does buy him articles of clothing. Fay Bentrup's child was born November 7, 1954. Defendant was at the hospital at the time and paid the hospital bill. He still owes some on the doctor's bill. The child was given the name of Bentrup. Defendant tried to have the child baptized in his name, but it was baptized in the name of Bentrup at the Holy Family parish, where Fay Bentrup belonged. His wife called him and asked him not to have the child baptized in his name.

Defendant further testified that plaintiff often made derogatory remarks relative to his parents, and referred to him as being the "black sheep" of the family; that she claimed his parents were helping his brother and announced she would have his parents put under a peace bond, and suggested that he go and live with them. Plaintiff denied she ever told defendant that he should go back and live with his parents.

On cross-examination defendant testified that he thought it unfair after he had committed adultery with Fay Bentrup for his wife to continually throw it up to him. He stated he thought sexual life was a good part of married life, maybe between seventy-five and eighty-five percent. He reaffirmed his previous testimony that during the marriage plaintiff got breakfast for him only two, three or four times at most, and that she fixed lunch for him about an equal number of times. He stated she did prepare the evening meals quite a bit, but toward the last he became the cook. She averaged about 200 nights a year getting dinner.

Defendant testified that at different times he would visit his adopted daughter at plaintiff's house. On two occasions after he was inside the house a policeman came and said he had received a call stating that defendant was disturbing the peace. No arrests were made on these occasions. Defendant testified that when he went to call upon his daughter he could not stay long because plaintiff "constantly threw Fay Bentrup up to me. That was every time I went over there * * * You see she just held that woman up to me all the time, until she made it so miserable I would leave. She told me several times she did not care whether or not I came over there to see the child, because as far as the child was concerned, she had told the child she had no father."

On one occasion after the separation defendant went to plaintiff's house to get his car. He took with him two policemen on the theory there would be trouble. Plaintiff refused to give him the keys to the car. Defendant then pried open the garage door and was in the act of getting his car started when plaintiff came out and had him arrested for peace disturbance. Plaintiff was also arrested at that time.

Defendant also testified that plaintiff falsely accused him of bringing lice into the house and giving them to the child.

Defendant testified that Fay Bentrup gave him a Christmas present prior to this

separation; that he took her to work frequently; that he sent Fay some roses; that he visits her three or four times a week, but has had sex relations with her only once.

Plaintiff testified she was willing to take back her husband, but he said he would not come back; that she had told him she would take him back if he would make amends, by which she meant not disregard their marriage vows.

As heretofore stated, the separation of these parties occurred either May 17 or May 18, 1954. Defendant made no contribution to the support of plaintiff or the child until about one month later when he contributed $35. This was made in the Prosecuting Attorney's office on June 19, 1954, after plaintiff had made a complaint against defendant. At the hearing in this court, counsel for defendant stated, that pursuant to an agreement made at that time, defendant paid $35 per week to his wife for the support of his wife and child, until an order for temporary support in the sum of $30 per week was made in a divorce suit, which defendant filed against plaintiff shortly after the meeting in the Prosecuting Attorney's office. This statement was not denied by plaintiff's counsel. The record does not show the date when the divorce suit was filed, and as near as we can determine from the record, the order for the temporary allowance was made in November 1954. Defendant testified that as long as the divorce suit was pending he made all payments due thereunder, except one due in June 1955, which payment was enforced by plaintiff suing out a writ of garnishment. The divorce suit was later dismissed (date not shown) and during the period from the date of its dismissal until the filing of this suit defendant continued to pay plaintiff $30 per week.

The evidence further shows that during the first month after the separation plaintiff purchased from the Famous Barr Department Store and charged to defendant's account $235 worth of clothing for herself and child. This debt was thereafter paid by defendant by installments at the rate of $10 per month. Also at the time of the separation defendant gave his wife $150 to deliver to her mother in payment of a debt owed by him to his mother-in-law.

Defendant's gross salary up until two weeks before the trial amounted to $175 for each two week period. At the time of the trial his gross salary was $168.00 for each two week period. In addition to this income defendant worked at a filling station approximately 10 hours each week, receiving as pay therefor the sum of $1.00 per hour. Plaintiff read into the record a statement furnished by defendant's employer showing defendant's earnings from January 1, 1958 to November 15, 1958. The gross earnings of defendant from his employment at International Shoe Co. during this 10½ months' period was $3,956.08 and his take home pay $3,406.63.

Plaintiff in her testimony gave a detailed list of her expenses. These came to a total of $81.98 per week. Defendant lives with his parents. He pays his parents $25 per week board which also covers washing, ironing and lunch.

■ In suits of this character there are certain rules of law which must be observed in passing upon whether a wife is entitled to the relief of separate maintenance. The statute (Section 452.130 RSMo 1949, V.A. M.S.) provides that an action for separate maintenance may be maintained by the wife "When the husband, without good cause, shall abandon his wife, and refuse or neglect to maintain and provide for her, * * *." To warrant a recovery under this statute the husband must both abandon and fail or refuse to support the wife. Woodman v. Woodman, Mo.App., 281 S.W.2d 555; Grieshaber v. Grieshaber, Mo.App., 313 S. W.2d 763; Elsey v. Elsey, Mo.App., 297 S.W. 978; Perkins v. Perkins, 236 Mo. App. 616, 157 S.W.2d 253; Broaddus v. Broaddus, Mo.App., 221 S.W. 804; Herbig

v. Herbig, Mo.App., 245 S.W.2d 455. The element of abandonment may be shown to be actual, that is, where the husband leaves his wife and remains away from her without just cause with the intent to discontinue the marital relation, or he may abandon his wife by treating her in such a way as to justify her in refusing to live with him as his wife. Dietrich v. Dietrich, Mo. App., 209 S.W.2d 540; Remley v. Remley, Mo.App., 208 S.W.2d 807; Reeve v. Reeve, Mo.App., 160 S.W.2d 804; Elsey v. Elsey, supra.

■ Failure or refusal to support is shown by proof that the husband has failed to suitably provide for his wife, taking into consideration the manner in which she was accustomed to live, the wife's necessities, the husband's needs and his ability to pay. Bingham v. Bingham, 325 Mo. 596, 29 S.W. 2d 99; Reeve v. Reeve, supra; Stauffer v. Stauffer, Mo.App., 313 S.W.2d 597. And even where the husband, after abandonment, has been contributing to his wife's support, the court may inquire into the sufficiency of such contribution. Hoynes v. Hoynes, Mo.App., 218 S.W.2d 823.

■ The action is in its nature an equitable one, and, upon appeal, the appellate court is not bound by the finding of the trial court, but may review the evidence and reach its own conclusion thereon, without regard to the finding of the lower court. In other words, the case is triable in the appellate court de novo upon the record. However, the appellate court will largely defer to the trial court's finding upon all facts relative to which there is a conflict in the evidence.

■■ With these rules of law in mind, we have carefully examined all the evidence in the record, and have reached the conclusion that plaintiff has successfully borne the burden of proof which the law cast upon her with reference to the issue of abandonment. The evidence on this issue was conflicting, but in our judgment, that of the plaintiff is the more credible. Not only has she shown actual abandonment, but has proven in our judgment, that she is the innocent and injured party. We also believe that the evidence shows that defendant failed to furnish adequate support for plaintiff and his child. In reaching this decision we have accepted as true defendant's evidence with respect to his weekly contributions. At the present time plaintiff's salary as an employee of the International Shoe Company amounts to $168 for each two week period, or $4,368 per year. In addition he earns about $10 per week working at a filling station. This amounts to $520 per year. His total gross income therefore amounts to $4,888.00. His contribution to the support of his wife and child since November 1954 has been $30 a week, or $1,560 per year. This, in our judgment, is not adequate considering his earnings, his needs and the needs of his wife and child. We find the amount fixed by the trial court to be proper under the circumstances.

The judgment of the trial court is affirmed.

WOLFE, J., and SAM C. BLAIR, Special Judge, concur.

RUDDY, J., not participating.