Rufus Irven VALENTINE, Plaintiff-Respondent,

v.

Helen L. VALENTINE, Defendant-Appellant.

No. 30960.

St. Louis Court of Appeals.

Missouri.

May 15, 1962.

Josephus M. Todd, Louis E. Zuckerman, Ellsworth W. Ginsberg, St. Louis, for appellant.

Stemmler & Stemmler, George L. Stemmler, Frank W. Tomasso, John F. Mulligan, St. Louis, for respondent.

BRADY, Commissioner.

The respondent, hereinafter referred to as plaintiff, filed suit·for divorce against appellant, hereinafter referred to as defendant, and the defendant filed her answer and cross-bill for separate maintenance. The trial court found against the defendant on her crossbill and for the plaintiff on his petition and awarded him a divorce. The marriage took place on August ·27, 1960, and the separation occurred on October 7th of that same year.

The plaintiff based his petition upon general indignities, and alleged that immediately following the marriage the defendant had a complete change of attitude and informed him the marriage was a mistake; that upon the date of separation defendant left the plaintiff and refused to become reconciled; that defendant had told plaintiff's son, James, that she was going to "take his daddy to the cleaners", and would insist upon a lump sum of $6,240.00 in order to enter into a business transaction; that James became so nervous as a result of defendant's remarks that he had to be confined to a hospital for three days for treatment for a nervous disorder; that defendant constantly argued and quarreled with plaintiff, causing him to become extremely nervous; and that defendant boasted that she was receiving $20 per week alimony from a former husband and that she had been married on three previous occasions.

The defendant filed a denial of these allegations, and for her cross-bill for separate maintenance alleged general indignities in that plaintiff had a complete change of attitude following the marriage and informed defendant their marriage was a mistake; that on the separation date plaintiff told her to leave the home and has refused to become reconciled with her; that plaintiff told her that if she wished to live with him as his wife she would have to give up her daughter by a previous marriage; that plaintiff had often told her he married her only because he wanted a housekeeper, that he did not want a wife, and that he had never loved her and did not then love her; that plaintiff's son had constantly threatened the life of her daughter by saying he would cut her throat while she slept and the plaintiff had full knowledge of these threats; that while making the son's bed the defendant found a large dagger and several paring knives concealed therein; that when she moved to plaintiff's house, he refused to let her unpack and put her clothes away; that plaintiff refused to support her although able to do so, and forced her to buy her own food; and that plaintiff had often told defendant that his children were dissatisfied with her and her daughter. These allegations were denied by the plaintiff in a responsive pleading.

Plaintiff had two children by his deceased wife, James, and Mary Louise. James was fifteen years old at the time of trial, a student in high school and lived with his father and the defendant. Mary Louise, thirty-three years of age, is married to a man who was required by his employment to move often and at about the date of the parties' separation, she and her husband were in the process of moving from his last station in Missouri to one in Iowa. Defendant had a daughter, Linda, who also lived with this couple during the 42 days of this marriage. At the time of trial she was fourteen years old.

The plaintiff's evidence was given by himself, James, and a Mr. Risinger. Plaintiff testified that the reason for the separation was that defendant left the home; that he treated defendant with love and affection, supported her and provided a home for her; that " * * * I would go to work and she would take the kids to school, and we made it O.K. I didn't think anything was wrong, and she just moved out"; that on one occasion, before the children, she told him she had talked to her legal advisor and wanted $6,240 for six years' alimony so that she could go into business; that the defendant used her former married name of Murrell on the telephone listing, on the gas and electric bills, and on the mailbox; that the defendant said she didn't feel well when he discussed her unpacking, and never did unpack her clothes; that in September she stated she was dissatisfied and was going to move; that she told him she thought she had made a mistake and would rather be back like she was before the marriage; that she often told him she would " * * * make it so hot on me I wouldn't be able to pay"; and that " * * * she knew everyone in this business; she knew how to go at it. I wouldn't know what I was doing"; that she did not specify who "every one" was, but stated that " * * * she had nine points again me before I even went in the courtroom, and that I wouldn't win anyway"; that he got along fine with Linda, defendant's daughter, and that James and Linda got along "swell." On cross-examination, the plaintiff stated that he and Mary Louise were joint owners of two pieces of property in St. Louis, and was examined as to the cost and income therefrom, which testimony, in view of our disposition of this appeal, it is unnecessary to summarize here. He did testify that no one else paid anything on the Cleveland Avenue property where these parties lived; that he was contemplating this marriage when he purchased the property in July of 1960; that the defendant would call him up and tell him " * * * the kids were making her nervous, and the kids weren't getting along"; that "She called me one day at work, and she said, 'Your damn kid is in the

room, pouting.' I said, 'Wouldn't you think that would be a good thing to do, to go in his room and be quiet?'" Plaintiff further testified that he had never asked defendant to return to his home and did not want her to; that he sees defendant now about once a week when he gives her a check; that he knew defendant had been married three times before and had a daughter before he married her; that on October 7th, Mary Louise came to visit them over the weekend; that he did not ever tell the defendant to leave his home; that Mary Louise called and said she would visit over the week-end but he did not tell defendant she had to leave so Mary Louise could have the room; that Mary Louise was not opposed to this marriage; that he had not discussed the divorce with Mary Louise prior to the 11th of October when he told her he was going to file his petition; that defendant was present when Mary Louise called to inform him of her impending visit; and that the defendant left at 9:00 on the morning of the 7th, and Mary Louise arrived at 8:00 that same night, and stayed two weeks.

James Valentine stated that he got along "O.K." with the defendant, had slight disagreements and arguments with Linda, but they went out socially together, swimming, to dances and football games, and he was on reasonably good terms with her; that about two or three weeks after the marriage, the defendant came to a show and got Linda and James, and said she was going to move out and was looking for a house to move into; that he heard the defendant make the statement as to seeing her legal advisor and getting $6,240 to set her up in business; that defendant said "* * * she would make it so hard on us we couldn't pay the court costs. She was going to fight it and build up a big bill. She said at times she wasn't going to take any furniture, or anything like that; she was going to get the alimony. She would go to court for that"; that defendant unpacked Linda's clothes but not her own, except for the ones she would use during the week, and when

asked about it the defendant would say she was sick; and that he never saw anything happen or heard plaintiff say anything that would cause her to leave. On cross-examination James testified that before the marriage he would visit Linda and the defendant at their house, which was then a block away; that he never heard his father say he was dissatisfied with the marriage; that he did not discuss the marriage with Mary Louise but did discuss disagreements between him and Linda; that Mary Louise writes his father often and telephones frequently, but was home only three times during the marriage and did not interfere with it; that he was on the upstairs telephone extension and heard the conversation that took place when Mary Louise called about coming for a visit on the 7th; that his sister did not say the defendant would have to leave because she needed the room; that the house has four bedrooms and there was enough room for Mary Louise without defendant leaving; that defendant had been very nice to him and treated him as a son; and that when his father saw the defendant after the separation, he and Linda would go ice-skating as they are still friendly.

The witness Risinger stated that he had known the plaintiff for about fifteen years and the defendant for two years; that on the night before the marriage defendant was talking to the witness's wife in his presence and said that "* * * she was afraid she was making a mistake but she was going to go ahead with it. She wasn't sure she was ready to settle down at that time."

The defendant testified that during the marriage she would love the plaintiff "* * * as much as he would let me * * *" but that "When his daughter would come home they would either quit talking completely, or the boy and he would take off and go some place. I don't know where they went; I wouldn't question them. Then maybe after the daughter left they wouldn't talk, and the boy would stay in his room and wrestle and fight, and cause me

trouble when I cooked." Defendant testified she left plaintiff, and gave this explanation why she had done so:

"Yes. Three weeks before that his daughter was home that weekend. When she left that Sunday he told me to get a paper, we were going to look for a place for me to live. He couldn't see for me and him to live together, he had been so dissatisfied with the marriage. He said it had gone as far as it could, and the children were very dissatisfied with the marriage. We looked for flats on Russell, and on Tower Grove, and all over South St. Louis. We looked at a dozen places. He complained about all the places, and talked about the places he had empty at that present time, and couldn't figure how he could get the rent for them in the condition they were. I asked him to think it over, whatever I was doing I would do better, and whatever Linda was doing I would keep her in the room completely. When she came home from school I would keep her in the room, and when I could I would keep Jimmy out of the room. In the three weeks if his daughter wasn't home she was on the telephone. She called us every night. She was living in Joliet, Illinois, and she always wanted to talk to her dad. Before that she would talk to me, but those last three weeks she would say, 'This is Mary Louise, and I want to talk to Dad.' She was always in a hurry. That particular weekend, before I left, he had a telephone call on Wednesday. I answered the phone, we were in the kitchen, and I told him it was Mary Louise. Jimmy went upstairs on the extension, Mr. Valentine answered the phone on the desk in the reception hall. He said, 'Just a minute. I want to go and get a piece of paper.' He told me to hang up, but I did not. I listened, and she told him to have me out of there by the 9th, Friday night, or October 7th, or she and her husband would put me out. I tried to talk to

him the next morning about it. He just brushed me off, but he did tell me I would have to get a place, that his children were strictly dissatisfied, and he couldn't keep on."

Her further testimony was that on the day of the marriage, as they walked out of the courthouse, he took the marriage certificate from her and said, "Let's tear it in two, because we made the biggest mistake of our lives", and later said, "Let's burn it. You light one end, I'll burn the other", and handed her matches; that two or three times a day he told her the marriage was a mistake, and told her that he did not love her and would never love anyone but his deceased wife; that she had known plaintiff for about fourteen years and they had been going together since the last of March or first of April of 1960; that she borrowed $100 from her sister, which she put down on the house on Cleveland Avenue; that when she moved to this house, she took her furniture, but it " * * * wasn't good enough, so they asked me to store my furniture in the basement and attic"; that she did put her kitchen furniture in the house; that every time she would try to unpack " * * * he would say, 'Sis will have to go through the drawers and take my mother's things out' ", that her husband asked her to wait until " * * * she came in again * * *" as there were old glasses in the drawers; that the plaintiff wouldn't let her use the bedroom set she had for Linda and so she bought a new one; that with respect to supporting her, plaintiff told " * * * my daughter she and I were too expensive, he couldn't afford us. He would give us money and we had enough bills to eat that up. He owed everybody. I guess I was supposed to salvage enough to buy the groceries. I bought the groceries out of the Twenty Dollars Bob Murrell sends my daughter"; the defendant further testified that she drew out money of her own from time to time and offered to draw all of her money out and pay the bills if plaintiff thought that would help save the marriage as she was willing to

give up everything to try to live with plaintiff and his family. With respect to Risinger's testimony, she denied she had made "* * * any remarks * * *." The defendant was asked if she ever told the plaintiff she wanted $6,240.00, and answered, "I don't even know where he gets those figures. I don't know where he got those figures. What was it he said, over a period of how many years?" Defendant further testified that plaintiff told her, "* * * the children are the reason he is suing for divorce. He keeps telling me we don't need a divorce, when the son is grown and we can become more reconciled as they get older, we could go on together, and I think we could." It further appeared that plaintiff at the time of trial was giving defendant $20.00 a week, and that her doctor bill and medicine amounted to $20.00 the month of trial; that she and plaintiff were still on friendly terms, and she sees him once or twice a week or, as she stated, whenever his son would allow plaintiff to see her; that he took her shopping occasionally and bought her a dress two or three weeks before trial.

On cross-examination, defendant testified that "they" stopped her from unpacking by taking anything she put in the drawers out of them, and what she hung in the closets was taken down; that she still thinks a lot of plaintiff; that she did not know she and Mary Louise were having any trouble until plaintiff told her to move, until she heard it over the telephone, that Mary Louise was not rude, "* * * I would call it not talking, period"; and when asked, "Actually his daughter treated you nice?" replied, "She didn't talk a lot. She would make her demands. I tried to meet them"; that she had never been repaid the $100.00 she paid as earnest money on the house, and had repaid her sister with her own funds, but she had received the closing costs she advanced paid back to her by the plaintiff; and that the reason the telephone, gas and electric were in the name of Murrell was that she would have had to pay a deposit to get it in the name Valentine. Upon questioning by the court, it appeared defendant was award-

ed the divorce in each of her previous marriages.

Linda Murrell stated that her mother seemed to give the plaintiff all the affection he would allow, and treated him "* * * as a wife should"; that she got along well with the plaintiff, and "fairly well" with James; that she had never heard her mother make any financial demands on plaintiff or state that the marriage was a mistake; and, when asked if plaintiff contributed anything to her support, stated "Just what he gives my mother. Sometimes my food would be bought out of it."

Defendant presents two points upon this appeal. She first urges that the evidence is insufficient to establish that the plaintiff was the innocent and injured party, and therefore the trial court erred in granting him a divorce. Her second contention is that the evidence clearly establishes that she was entitled to a decree of separate maintenance.

Insofar as the defendant's second contention is concerned, to grant recovery of separate maintenance it must be proven that the plaintiff had not only abandoned or constructively abandoned the defendant, but that he had failed to support his wife after the abandonment, § 452.130 RSMo 1959, V.A.M.S.; Genazzi v. Genazzi, Mo. App., 343 S.W.2d 686 at [1] page 691, and cases cited. In the Genazzi case, at [2], page 692, this court also held that failure or refusal to support can be shown by proof that the husband has failed to suitably provide for his wife, taking into consideration the manner in which she was accustomed to live, her necessities, and needs and ability to pay. This transcript clearly compels us to rule that the defendant failed to bear her burden of proof as to this issue. It follows that she was not entitled under the evidence in this case to a judgment awarding her separate maintenance.

In her brief, defendant cites and relies upon Kistner v. Kistner, Mo.App., 89 S.W. 2d 106. This record does not disclose that

plaintiff in any way encouraged his children in a defiant and vindictive attitude toward defendant, nor that he failed to correct such an attitude or lack of respect. This record does not even show that plaintiff's children had such an attitude or exhibited lack of respect toward defendant. The defendant's own testimony as to how she got along and still gets along with James belies any such inference. Her daughter still sees the boy, as does she. They are all still on friendly terms. Certainly the only reasonable implication is that James' relations with defendant were in fact as he described them, for if they were not, the defendant would not still associate with him nor allow her daughter to do so. Insofar as the allegations in the petition concerning James' threats to kill Linda, and his concealing knives in his bed, are concerned, it should be pointed out that there was not one iota of testimony offered on the point by defendant or Linda. As pointed out, not only was James' testimony as to his relationship with Linda contradictory to this allegation of defendant's cross-bill, but so was Linda's testimony. Defendant's counsel urges that, because defendant made such a charge in a cross-bill to which she solemnly swore, it should be given credence. It requires no citation to recall to knowledge that pleadings do not prove themselves, except under certain specified pleading situations which are not here present.

Defendant also relies upon the conduct of Mary Louise to bring this case within the application of what this court held in Kistner v. Kistner, supra. Again her own testimony goes a long way to refute her contention. Defendant gave no testimony that would compel the inference that plaintiff's daughter, Mary Louise, was rebellious or contemptuous. At the most, it showed that she and the daughter did not talk together. Perhaps this was the fault of the plaintiff's daughter, perhaps not. We cannot answer that question on the basis of this testimony, but it is unnecessary to do so. Certainly such an attitude by the plaintiff's daughter toward the defendant falls far short of that which the testimony in Kistner disclosed. Defendant herself testified that she did not even know that she and Mary Louise were having any trouble until the telephone call. The defendant's evidence as to what plaintiff's daughter said over the telephone on that occasion was contradicted sharply by James' testimony, and by that of the plaintiff. It should also be pointed out that so was every other allegation of her cross-bill, just as she contradicted in her testimony the allegations of plaintiff's petition. What is here presented is not a case, as was Kistner v. Kistner, see 89 S.W.2d 106, l. c. 112, where the transcript disclosed that, "It is obvious from the testimony of both plaintiff and his daughter that neither of them showed a proper consideration for defendant in her own home, and that plaintiff's failure to correct his daughter with respect to her defiant and vindictive attitude toward defendant intensified the quarrels between the parties." What this transcript discloses is a case where the evidence given by each party contradicts that given by the other. In such circumstances, our courts have long adhered to the language of the statute, § 510.310, subsection 4, RSMo 1959, V.A.M.S. and while recognizing our duty to review the case upon both the law and the evidence and reach our own conclusions, we are also deeply cognizant of the wisdom of the language therein that we cannot set aside a judgment of the trial court unless it is clearly erroneous, and we are to give due regard to the opportunity of the trial court to judge the credibility of the witnesses. The allegations of the petition, if substantiated by proof, stated grounds of general indignities upon which a divorce could be granted. Whether or not these allegations or any of them were substantiated by proof depended in the main, and excepting the testimony of James and the witness Risinger, upon whether the trial court believed the plaintiff or the defendant. The trial court believed the plaintiff, and under the facts here dis-

closed it was certainly not clearly erroneous to do so. Accordingly, the trial court's decree of divorce was not erroneous.

The judgment of the trial court should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court. The judgment is affirmed.

ANDERSON, P. J., WOLFE, J., and HARRY A. HALL, Special Judge, concur.

RUDDY, J., not participating.